# CASES DETERMINED

# August Term, 1912.

## State vs. Law.

*May 18—September 20, 1912.*

*Abortion: Evidence: Dying declarations: Coercion or inducement: Instructions to jury: Physicians and surgeons: Privilege: Experts: Competency: Statutes construed: Relevancy of testimony.*

1. No reasonable request for a statement of the circumstances under which a mortal injury was inflicted, and no reasonable or proper insistence upon such statement where such insistence is essential to diagnosis by a physician or as a protection against prosecution, will be sufficient to exclude a dying declaration.
2. Thus, a dying declaration in which a woman charged defendant, a physician, with having attempted an abortion was not rendered incompetent by the fact that another physician, called to treat her when she was in a dangerous condition, had refused to do so until he procured from her a full history of the case, either to enable him to treat her or for his own protection.
3. Instructions given to the jury with reference to such a dying declaration and the weight and credit to be given it, by which the jury were allowed to pass upon the mental capacity of the declarant and the question whether her declaration was made freely and voluntarily, are approved.
4. Whether sec. 4075, Stats. (Laws of 1911, ch. 322 and ch. 664, sec. 44), is applicable to criminal cases, not determined. Barnes and Siebecker, JJ., are of opinion that it is applicable.
5. Sec. 4078d, Stats. (Laws of 1905, ch. 149),—providing that "no person shall be excused or privileged from testifying fully under oath in any prosecution brought under" secs. 4352 or 4583, Stats. (1898), and providing for immunity of the witness from

prosecution for any transaction so testified to,—takes away, in the cases specified, not only the privilege against self-incrimination, but also the professional privilege of a physician accorded by sec. 4075, Stats. BARNES and SIEBECKER, JJ., dissent.

6. Sec. 1436, Stats. (Laws of 1903, ch. 426, sec. 8),—providing that "no person practicing medicine, surgery, or osteopathy shall have the right . . . to testify in a professional capacity as a physician or surgeon or insanity expert in any case, unless he or she holds a license," etc.,—does not preclude experts in bacteriology, biology, embryology, etc., from testifying as such, where they are not persons practicing medicine, surgery, or osteopathy and do not testify in a professional capacity as physicians, surgeons, or insanity experts.

7. Where a woman upon whom defendant is alleged to have attempted an abortion stated in a dying declaration that her sickness followed the removal of a tube alleged to have been inserted by defendant in her uterus, but did not say that such sickness, to the point of disability, followed immediately upon such removal, and it appeared that the severe or acute sickness did not set in until three days later, evidence that her husband had sexual intercourse with her during that interval was irrelevant and inadmissible to contradict her dying declaration.

EXCEPTIONS from the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Overruled.* ·

Exceptions allowed under sec. 4720, Stats. (1898), to review the rulings of the circuit court for Dane county made in the above entitled action. The information is as follows:

"I, Robert N. Nelson, district attorney for said Dane county, hereby inform said court that *A. R. Law* did on the 19th day of July, 1911, at the city of Madison, in said county, wilfully and feloniously employ upon the body and womb of Annie O'Brien, being then and there pregnant with a child, a certain instrument, to wit, a rubber tube commonly called a catheter, with intent thereby then and there wilfully and feloniously to destroy such unborn child, the same not being necessary to preserve the life of such mother, the said Annie O'Brien, and not having been advised by two physicians to be necessary for the purpose of preserving the life of such mother, the said Annie O'Brien, by means whereof the death of the said Annie O'Brien was produced and whereby the

said *A. R. Law* did on the 26th day of July, 1911, feloniously kill and slay the said Annie O'Brien, against the peace and dignity of the state of Wisconsin."

The statute defining the offense is sec. 4352, Stats. (1898).

Assignments of error:

1. The court erred in admitting in evidence the alleged dying declaration of Annie O'Brien taken down in typewritten form.

2. The court erred in admitting in evidence the testimony of Robert N. Nelson as to the alleged oral dying declaration of Annie O'Brien.

3. The court erred in admitting in evidence the testimony of Deborah Richter as to the alleged oral dying declarations of Annie O'Brien.

4, 5, 6, and 7. The court erred in admitting as evidence the testimony of Drs. Joseph Dean and Joseph P. Donovan relative to privileged communications, and also relative to other things, as experts.

8, 9, and 10. The court erred in permitting C. R. Bardeen, C. H. Bunting, and M. P. Ravenel to testify as experts, because there was no proper proof of their qualifications.

11 and 12. The court erred in excluding the testimony of Jerre O'Brien.

The foregoing presents an abbreviated statement' of the exceptions and assignments of error which are formally set forth in the record.

For the state there was a brief by the *Attorney General, Russell Jackson,* deputy attorney general, *F. L. Gilbert,* special counsel, and *Robert N. Nelson,* district attorney; and the cause was argued orally by *Mr. Nelson, Mr. Jackson,* and *Mr. Gilbert.*

For the defendant there were briefs by *Richmond, Jackman & Swansen* and *Rufus B. Smith,* and oral argument by *Mr. T. C. Richmond* and *Mr. Smith.*

With reference to the first, second, and third assignments of

error counsel for defendant cited: *State v. Carter,* 107 La. 792, 32 South. 183; 4 Ency. of Ev. 933, 939, 945, 946; *State v. Jessewell,* 22 R. I. 136, 46 Atl. 405, 407; *McHugh v. State,* 31 Ala. 317, 320; 1 Greenl. Ev. § 156; *People v. Loper,* 159 Cal. 6, 112 Pac. 720; *People v. Barric,* 49 Cal. 342, 344; *People v. Thompson,* 84 Cal. 598, 605, 24 Pac. 384, 386; *Justice v. State,* 99 Ala. 180, 13 South. 658; *Comm. v. Casey,* 11 Cush. 417; *Ledbetter v. State,* 23 Tex. App. 247, 5 S. W. 226, 227; *State v. Banister,* 35 S. C. 290, 14 S. E. 678; *Maxwell v. State,* 40 South. 615; *State v. Roberts,* 12 N. C. 260; *Peter v. State,* 4 S. & M. 31, 37; *Deathridge v. State,* 1 Sneed, 75; *Stephen v. State,* 11 Ga. 225; *People v. Johnson,* 41 Cal. 452; Roscoe, Crim. Ev. (12th ed.) 41.   Counsel for the state cited: 4 Ency. of Ev. 947, 979, 980; 2 Wigmore, Ev. § 1442; *State v. Cameron,* 2 Pin. 490; *Miller v. State,* 25 Wis. 384; *State v. Martin,* 30 Wis. 216; *State v. Dickinson,* 41 Wis. 299; *Richards v. State,* 82 Wis. 172, 51 N. W. 652; *Hughes v. State,* 109 Wis. 397, 85 N. W. 333; *Van Haltren v. State,* 142 Wis. 143, 124 N. W. 1039; *Novkovic v. State,* 149 Wis. 665, 135 N. W. 465; *Vass v. Comm.* 3 Leigh, 786; 1 Greenl. Ev. § 159.

In behalf of defendant there was cited in support of assignments of error 4, 5, 6, and 7 the following: Secs. 1436, 4075, and 4078*d,* Stats. (1898), with amendments; *People v. Murphy,* 101 N. Y. 126.   In behalf of the state: *Hauk v. State,* 148 Ind. 238, 46 N. E. 127, 47 N. E. 465; *Seifert v. State,* 160 Ind. 464, 67 N. E. 100; *State v. Grimmell,* 116 Iowa, 596, 88 N. W. 342; *Pierson v. People,* 79 N. Y. 424; *People v. Harris,* 136 N. Y. 423, 33 N. E. 65; *People v. West,* 106 Cal. 89, 39 Pac. 207; *People v. Griffith,* 146 Cal. 339, 80 Pac. 68; *State v. Height,* 117 Iowa, 650, 91 N. W. 935; *People v. Glover,* 71 Mich. 303, 38 N. W. 874; Jones, Ev. (2d ed.) § 761(779); 4 Wigmore, Ev. § 2385; 10 Ency. of Ev. 135; *People v. Benham,* 14 N. Y. Crim. Rep. 434.

In behalf of defendant there was cited in support of as-

signments of error 11 and 12 : *Robinson v. Talmage,* 97 Mass. 171; *Litchfield v. Merritt,* 102 Mass. 520, 524; *Gosselin v. King,* 33 Can. Sup. Ct. 255, 277; *King v. Sassaman* (Tex. Civ. App.) 64 S. W. 937; *Polson v. State,* 137 Ind. 519, 35 N. E. 907; 2 Words & Phrases, 1342; *Hagerman v. Wigent,* 108 Mich. 192, 65 N. W. 756; *Estate of Van Alstine,* 26 Utah, 193, 72 Pac. 942; *Stanley v. Stanley,* 112 Ind. 143, 13 N. E. 261; *Comm. v. Cleary,* 152 Mass. 491, 25 N. E. 834; *Flora v. Anderson,* 75 Fed. 217; *Epstein v. Pennsylvania R. Co.* 143 Mo. App. 135, 122 S. W. 366. On the part of the state: *Smith v. Merrill,* 75 Wis. 461, 44 N. W. 759; *Aveson v. Kinnaird,* 6 East, 192; *Miller v. Miller,* 14 Mo. App. 418; *Comm. v. Sapp,* 90 Ky. 580, 14 S. W. 834, 29 Am. St. Rep. 405; 6 Ency. of Ev. 867, 903; 1 Greenl. Ev. § 337; *Goodrum v. State,* 60 Ga. 509; *U. S. v. White,* 4 Utah, 499, 11 Pac. 570; *Stanford v. Murphy,* 63 Ga. 410; *Berry v. Randall,* 83 Ind. 143, 23 Am. & Eng. Ency. of Law (2d ed.) 95.

The following opinions were filed June 4, 1912:

TIMLIN, J. The testimony offered on the part of the state tended to show that on Wednesday, July 19, 1911, the deceased, Annie O'Brien, a married woman, residing with her husband, consulted the accused, a licensed physician, in a professional capacity, informing him that she was about five weeks advanced in pregnancy and wished him to produce a miscarriage, and that defendant, by the use of an instrument for that purpose, inserted a tube in the uterus. On Thursday, the next day, she removed the tube, and following this (how soon not stated) she became sick. This happened a week before the day of her death, and she had been sick several days before her death according to her statement to the nurse, Richter. On the evening of July 25th the husband of deceased called Dr. Dean on the telephone, and the latter declined to go to O'Brien's house because he, Dean, was him-

self sick.   He gave O'Brien the names of several other physicians whom the latter might call.   Later that night O'Brien called personally at Dean's house, roused the latter, and told him that his wife had been to see Dr. Law, and gave such description of her condition as led Dr. Dean to suspect that something irregular had been attempted.   Dr. Dean still refused to call and recommended O'Brien to get another doctor, and told the latter that on his way to the hospital in the morning he would call on Mrs. O'Brien.   He did so, and found her in an advanced stage of peritonitis, her pulse and temperature indicating a dangerous condition, and found a bloody discharge from the vagina.   Dr. Dean informed her that he would not take charge of her case unless she made a full statement to him concerning it.   He insisted upon this, he says, to enable him to treat the case properly and also for his own protection.   She made such statement and implicated the defendant as having, with her consent, attempted an abortion.   Dr. Dean concluded the only way to save her life was to take her to the hospital and, by an operation, open the abdominal cavity and drain off the pus there apparently collected.   She was taken to the hospital.   Dr. Dean called in Dr. Donovan.   It was found that the patient's condition was such that she failed to respond to ordinary heart stimulants, and this, together with other symptoms, convinced the doctors that an operation could not be safely performed, and also that the woman was *in extremis*.   Knowing that she was about to die, she made a dying declaration, implicating the accused, to Deborah Richter, one of the nurses at the hospital. Dr. Dean informed the district attorney, who came to the hospital and took her dying declaration in the presence of the two doctors, Dean and Donovan, the nurse, and a lady stenographer, who afterwards wrote it out in typewriting.   The woman died in the afternoon of that day, and an autopsy disclosed, according to the opinion of the physicians who conducted the same, that the cause of the death was acute peri-

tonitis originating in the uterus and spreading from thence to the Fallopian tubes and thence to the peritoneum generally.

The accused took the stand in his own behalf and testified that Mrs. O'Brien called at his office for medical treatment on Wednesday, July 19th, about 10:30 o'clock in the morning, and complained of a pain in her right side, which she had felt for a year or two before. When she got into the private office for the purpose of having an examination made relative to this pain in her side, she informed the accused that she had passed her menstrual period two or three days and wished him to ascertain whether she was pregnant. He placed her upon an operating table, found a soreness over the right ovary, and found she was not pregnant. He gave her an emmenagogue and some salacetin tablets and she left. There was no request that he produce a miscarriage and nothing was inserted in the uterus. He heard nothing from her until Sunday evening, following, between 7 and 8 o'clock, when he received a telephone call from Mr. O'Brien requesting him to come and see his wife, because the pain in her side was worse. He went there and was informed that the pain had subsided, and that the tablets he had given on Wednesday had brought about menstruation, and he came away without giving medicine or treatment of any kind. There were others present all the time. On Monday evening he was again called by telephone and he arrived at the O'Brien house between 7 and 8 o'clock. He found Mrs. O'Brien quite a sick woman, temperature $101\frac{1}{2}$, pulse up near 100, respiration and heart action bad, and she complained of pain in her side extending across the abdomen. The abdomen was swollen or puffed up and there was tenderness to the touch. He washed out the uterus with hot water and alcohol, her husband holding the lamp for him. The fluid returned clear and without odor. He left some instructions, promised to come in next day, was prevented by something, and Tuesday evening Mr. O'Brien again called him by

telephone, and he came and found Mrs. O'Brien very sick; temperature 104½, pulse about 150, abdomen swollen, distended, and sensitive to the touch, respiration rapid, short, and labored, like one in distress. He told two women who were in the house and also told Mr. O'Brien he did not think there was any chance for Mrs. O'Brien to get well, but she might live a little while, a day or so. He prescribed some fat-free tincture of digitalis and said to Mr. O'Brien: "If your wife is alive in the morning let me know and I will come down again." In the morning, about 7 o'clock, Mr. O'Brien told him that they had engaged Dr. Dean.

1. It is contended that the refusal of Dr. Dean to treat the patient until he procured from her a history of the case, either to enable him to treat her or in his own protection, was such coercion of the patient or such inducement as to render incompetent not only what she then and there told Dr. Dean, but all dying declarations thereafter made by her at the hospital to the same effect and under the same influence. It is argued that, having this origin, the dying declarations were tainted, no matter how frequently repeated thereafter, because of the nature of the inducement held out, the feeble condition of the declarant, and because it is shown by evidence that a person in this advanced stage of peritonitis, when septicemia has already set in, is not sufficiently conscious or intelligent to make a competent dying declaration. If the testimony relating to her mental condition were without dispute, and if the statement made to her by Dr. Dean was plainly a threat or inducement for her to make a charge against the accused, and it appeared she was still in that condition when she made the dying declarations and still laboring under the duress or inducement of what Dr. Dean said to her, it would have been the duty of the trial court to exclude the dying declarations. But that was not the case. The statement of Dr. Dean did not suggest that she charge the accused with any crime. It was a very proper request

for him to make under the circumstances. It probably had influence in inducing her to make disclosure and to tell the truth. But that was merely incidental, and a charge against the accused was not the direct result of the request at all in case the accused had done nothing wrong or criminal. Several witnesses who saw, and talked with, Mrs. O'Brien at the hospital prior to and at the time of the dying declarations testified to her mental competency in no uncertain language. Under such circumstances the trial court would not be justified in excluding the dying declarations, but very properly admitted them in evidence, instructing the jury concerning the same as follows:·

"In considering the statements made by Mrs. O'Brien on the day of her death, you should consider the fact that dying declarations constitute an exception to the general rules of evidence. They are in the nature of hearsay or second-hand evidence, and although for reasons of public policy, as well as because of the difficulty of obtaining better proof of the fact, they are under certain circumstances admitted in evidence, they do not have all the guarantees which surround evidence given under oath in a court of justice. It is assumed that being made in extremity, when the party is at the point of death and believes that all hope of the world is gone, they have some guarantee of their truth in view of the solemnity of the occasion or such as an oath in court would have. But it is clear that their value as evidence rests upon an assumption, and hence it is that while the law recognizes the necessity of admitting such proof on a par with an oath in a court of justice, it does not and cannot regard it as of the same value and weight as the evidence of a witness given in a court of justice under all the tests and safeguards which are there afforded for discovering the truth, for the accused has the opportunity in court of more fully investigating the truth of the evidence by means of cross-examination, which the defendant is denied in the case of a dying declaration, and the jury have the opportunity of observing the demeanor of the person while the testimony is being given from the stand. The power of cross-examination·is quite as essential to the process of eliciting the truth as is the obligation of an oath,

and where the life or liberty of the defendant is at stake the absence of the opportunity for cross-examination is a serious deprivation, which differentiates in nature and degree the evidence of a dying declaration from that which is direct and given upon the witness stand. The jury should not receive the impression that however admissible in evidence the dying statement is, it is as valuable or as authoritative for the purpose of proving the defendant's guilt as though this same evidence had been given by a witness in a court of justice with every opportunity to the defendant to investigate its truth by means of cross-examination.

"The mere fact that these statements have been admitted in evidence by the court is not in any way binding on you in your deliberations. You are at liberty and it is your duty to determine for yourselves whether the necessary facts have been established beyond a reasonable doubt by the evidence in this case which are a foundation for the consideration of these statements in evidence by you. These necessary facts are: First, that the statement was made voluntarily, at a time when Mrs. O'Brien knew and was fully conscious of the fact that she was in a dying condition. Second, that such statements were made at a time when she was fully conscious of all that transpired and fully understood the meaning and import of the questions and answers, and that her mind at that time was in such a condition that she was in such possession of her reasoning faculties as to entitle her declarations to credit at your hands, and that she fully understood and comprehended all of the facts, circumstances, and transactions dealt with in those statements. Third, that at the time the statements were made she was under no duress or compulsion, but that the statements were made freely and voluntarily by her. Fourth, that the statements were hers and not the statements of any other party. If you should find that any of these necessary facts just set forth are lacking, you will disregard entirely those declarations. The mere fact that the declarations have been admitted in evidence by the court does not in any manner determine for the jury anything as to the weight or credibility of these statements. You are the sole judges as to the weight and credibility to be given to these dying declarations under the rules that have just been stated, and if you find from the evidence that at the time said state-

ments or declarations were alleged to have been made Mrs. O'Brien was in such a mental condition as to not comprehend and understand all of the answers and the questions, or the import of the answers and questions, or if you find at that time she did not have such possession of her reasoning facul-ties as to entitle her declarations to credit, or if you find that such declarations were not freely and voluntarily given, but were given under coercion or compulsion, you are to disre-gard these declarations in arriving at your verdict. In ar-riving at a determination of this question you will take into consideration all the surrounding facts and circumstances as disclosed to you by the evidence in this case. In determining the weight or credibility to be given to these dying declara-tions, less weight and less credibility should be given to a declaration obtained from a person *in extremis* by means of leading questions than to a statement which is voluntarily made by the same person in narrative form. In considering these declarations you should take into consideration the man-ner in which the statements were obtained, whether they were narrative statements of facts or whether the statements were elicited by means of questions, and you should also take into consideration the form and nature of these questions as dis-closed to you by the testimony, and if from the testimony you believe that the declarations are in reality statements of some-one else, put into the mouth of Mrs. O'Brien by other parties, and not the statements of Mrs. O'Brien freely and voluntarily made, then you should disregard these statements in arriving at your verdict. It must appear with a great de-gree of certainty that the statements attributed to Mrs. O'Brien are in fact the statements made by her and not those of some other person. In determining what weight you will give to these dying declarations you must consider whether these declarations were induced by fear, or because of the fact that Dr. Dean had said to Mrs. O'Brien on the morning of the day that the statements were made that he would not treat her unless she made a full and complete statement to him; if these matters were in the mind of Mrs. O'Brien, and if they influenced her at the time of making these declarations to such a degree as to operate as a compelling force or reason for making these declarations, so that these declarations were not made freely and voluntarily, but were made under coercion;

if that be your findings, you should wholly disregard these declarations in arriving at your verdict.

"On the other hand, if you are satisfied beyond a reasonable doubt that these statements were made voluntarily, not under any duress or coercion or compulsion, when Mrs. O'Brien was fully conscious that she was in a dying condition, and when she was in such mental condition that she fully understood the meaning and import of the questions and answers, and that her mind was in such a condition at that time that she fully understood and comprehended all the facts, circumstances, and transactions relating to her condition and to the events which had taken place during the past week, and that these statements were her statements and not those of some other person, then you will give consideration to these dying declarations and give them such weight as you believe them entitled to receive after considering all the facts and circumstances in the case."

These instructions are so proper to such a situation as to be well worth preserving in the reports. It follows that the first, second, and third assignments of error covering the first, second, and third exceptions must be overruled.

2. Drs. Dean and Donovan were in attendance on Mrs. O'Brien and learned of the facts in the case by reason of their being in attendance. This information so acquired by them and each of them was necessary to enable them to prescribe for her. Each was sworn as a witness for the state and testified concerning her mental capacity at the time she made the declarations mentioned, as to the symptoms observed and treatment given her, and also to what was discovered in the autopsy conducted by them upon the body of Mrs. O'Brien on July 26, 1911. Sec. 4075, Stats., as amended by ch. 322, Laws of 1911, provides:

"No person duly authorized to practice physic or surgery shall be permitted to disclose any information which he may have acquired in attending any patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician or to do any act for him as a surgeon."

Before the amendment of 1911 the words "shall be compelled" appeared in this statute instead of the words "shall be permitted," as the statute now reads. The amendment of 1911 brought sec. 4075 more nearly in form with sec. 4074, relating to confessions to clergymen, and with sec. 4076, relating to communications by client to attorney.

The learned attorney general takes the broad ground that this statute has no application to criminal prosecutions. He cites authority to the effect that "the purpose of the statute . . . is to protect the patient and not to shield one who feloniously takes his life. The authorities uniformly support this position." This question was mooted but left undecided in *Smits v. State,* 145 Wis. 601, 130 N. W. 525. We leave the question still open and undecided.

Sec. 4078*d,* Stats. (Laws of 1905, ch. 149), provides:

"No person shall be excused or privileged from testifying fully under oath in any prosecution brought under the provisions of secs. 4352 or 4583 of the Statutes of 1898 or for any of the causes mentioned in either of said sections when so ordered to testify by a court of record or any judge thereof; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which such person may so testify or produce evidence, except for perjury committed in giving such testimony."

This prosecution is under sec. 4352 mentioned. It will be observed that the opening sentence of this section is broad enough to sweep away all privilege in such cases. Whether it should be interpreted and applied as broadly as its words might indicate, need not be decided here. All that is necessary to consider in the instant case is whether the provisions of this section take away, in prosecutions for abortion, the privilege conferred by sec. 4075, as amended by ch. 322, Laws of 1911. We think it does. Counsel for accused seek to limit the scope of sec. 4078*d* by the concluding sentence of that section, which provides that no person shall be prosecuted

or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which such person may so testify or produce evidence.    The effect of such construction would be to limit the sweeping words contained in the first sentence of the section to the privilege against self-incrimination.    This we cannot do.    It restrains the statute unduly.    The more reasonable interpretation is that the privilege against self-incrimination and the professional privilege of a physician are both taken away by sec. 4078$d$, but in order to render it valid and constitutional as to the first, the legislature added the last sentence in the nature of a proviso. This immunity from prosecution on account of anything which the accused is compelled as a witness to disclose is provided for in actions to recover public money by ch. 85, Laws of 1901; in actions to recover license fees, taxes, penalties, or forfeitures, by ch. 447, Laws of 1905; in actions relating to miscarriage or abortion, by ch. 149, Laws of 1905, which is sec. 4078$d$.    It also occurs in the so-called anti-trust law, sec. 1791$j$ et seq., Stats. (Supp. 1906).    In the latter case the particular privilege against self-incrimination is mentioned, that privilege taken away, and immunity from prosecution given in its stead.    In sec. 4078$d$ this particular privilege is not mentioned, nor is the immunity confined to an accused person, but all privilege is apparently abolished as to all persons in respect to such criminal prosecution.    Because of the nature of the crime and the necessity of resorting to medical evidence in order to establish its commission, we are satisfied that the privilege accorded by sec. 4075, Stats., as amended by ch. 322, Laws of 1911, is, in cases like this, taken away by sec. 4078$d$.    Assignments of error 4, 5, 6, and 7, covering exceptions 4, 5, 6, and 7, are therefore overruled.

3. Drs. Ravenel, Bardeen, and Bunting were not licensed to practice as physicians in this state.    Dr. Ravenel is a director of the State Hygienic Laboratory and professor of bacteriology in the University.    Besides teaching, his work in-

'cludes examination of bacteriological specimens. He has an M. D. diploma from a South Carolina university and has done post-graduate work at the University of Pennsylvania, at the Pasteur Institute in Paris, and also in Germany and Italy. He has practiced medicine and surgery in South Carolina, also in Pennsylvania. He testified to the effect that the tube of pus taken from the abdominal cavity of deceased contained the bacteria known as streptococci and he found bacterial indication of intense infection in the parts submitted to him for examination.

Dr. Bardeen is dean of the medical college at the State University, professor of anatomy and embryology. He has had experience in laboratory work and at clinics and hospitals. He made an examination which he detailed at great length, and was of opinion that pregnancy had taken place five or six weeks prior to death.

Dr. Bunting is professor of pathology at the University and specializes in histology and bacteriology. He has had practical experience as medical house officer at Johns Hopkins Hospital and has taken part in many *post-mortem* examinations.

None of these gentlemen had any license or certificate of registration as a physician in this state. Their testimony is challenged as incompetent under sec. 1436, Stats., as amended (Laws of 1903, ch. 426, sec. 8), reading as follows:

"No person practicing medicine, surgery or osteopathy shall have the right . . . to testify in a professional capacity as a physician, or surgeon, or insanity expert in any case, unless he or she holds a license from the Wisconsin Board of Medical Examiners, or the certificate of registration hereinbefore referred to, with a diploma from a reputable medical college or society or a certificate of membership in a medical society, and has been duly recorded as a practitioner in the state of Wisconsin; provided, that nothing in this act contained shall be construed as restricting any court in a criminal action from receiving the testimony of any person as a witness."

The gentlemen mentioned were not within the statute quoted, because they were not persons practicing medicine, surgery, or osteopathy, and they did not testify in a professional capacity as physicians, surgeons, or insanity experts. The proviso of the statute would also remove the disqualification theretofore mentioned so far as criminal cases are concerned. The mere fact that the science of medicine covers, includes, or requires some knowledge of bacteriology, or chemistry, or botany, or biology, or embryology would not exclude an expert in either of these sciences under sec. 1436, as amended by sec. 8, ch. 426, Laws of 1903. Assignments of error 8, 9, and 10, covering exceptions 8, 9, and 10, must be overruled.

4. Upon the trial counsel for the defendant called to the witness stand the husband of the deceased and propounded to him the following question: "I will ask you, Mr. O'Brien, whether or not during the latter part of that week you had sexual intercourse with your wife?" On objection by the state this testimony was excluded. We think this ruling was correct, because an affirmative answer would not raise any material issue or controvert evidence offered by the state upon any material point. It is only by the most strained inference that counsel for accused are able to imagine any contradiction. In her dying declaration Mrs. O'Brien said that her sickness followed the removal of the tube. In order to make this testimony relevant we must presume that sickness to the point of disability immediately followed the removal of the tube. The witness said no such thing. On the contrary, from both declarations, taken together, it is apparent that severe or acute sickness did not set in until Sunday night. The testimony of the defendant shows that he was called to see her again on Sunday evening and found her sitting up and in such condition that he came away without offering to give her medicine, treatment, or examination. Thus we have the deceased, after the week had passed, in the condition

last described. Under such circumstances the question proposed was entirely irrelevant to the guilt or innocence of the accused. Assignments of error 11 and 12, covering exceptions 11 and 12, are therefore overruled.

We find no error in the rulings of the court below so far as such rulings are presented by the exceptions taken and certified to this court. The merits of the case are not before us and we express no opinion thereon. The cause will be remanded to the circuit court for further proceedings according to law.

*By the Court.*—It is so ordered.

BARNES, J. (*dissenting*). I think it was error to admit the testimony of Drs. Dean and Donovan. That the error was prejudicial, if there was one, does not admit of doubt. It is held that their testimony was competent under sec. 4078*d*, Stats. (Laws of 1905, ch. 149). This section is broad and sweeping in its terms and is susceptible of the construction placed thereon by the court. However, I believe this construction of the statute to be erroneous, and, even if it is not, that these two physicians were debarred from testifying by ch. 322, Laws of 1911, which necessarily repealed sec. 4078*d* in so far as it applied to the testimony of physicians.

By sec. 4072, Stats. (1898), a husband or wife is not permitted to disclose confidential communications made by one to the other during marriage, without the consent of the one making the communication.

By sec. 4074, Stats. (1898), a clergyman is not allowed to disclose a confession made to him in his professional character, without the consent of the party confessing.

By sec. 4075, Stats. (1898), as it stood prior to its amendment in 1911, a physician could not be *"compelled"* to disclose information acquired in attending a patient in a professional capacity and which was necessary to enable him to treat the patient.

Under sec. 4075, as amended by ch. 322, Laws of 1911, no physician is *"permitted"* to disclose information acquired while attending a patient.

By sec. 4076, Stats. (1898), an attorney is not allowed to disclose a communication made to him by his client.

Sec. 4078*d* was not enacted until 1905, and if it amends or affects any of the foregoing sections it necessarily amends and affects all of them. It would be utterly illogical and inadmissible to single out sec. 4075 and say that it was affected by the law of 1905 while the other sections were not. There is no room for drawing any distinction between them. If these two doctors can be compelled to testify, then *Dr. Law's* wife, if he has one, might be called to the stand by the prosecution and be compelled to disclose any communication or admission made by him to her relative to the alleged criminal operation on Mrs. O'Brien. Likewise, *Dr. Law's* attorneys might be called and asked as to any statements made by him to them which would tend to show guilt on his part, and be compelled to make a full disclosure. Furthermore, if the doctor was a member of a church having a confessional, and he had made a confession between the date of the commission of the alleged offense and the date of the trial, the clergyman to whom the confession was made could be compelled to testify to what the doctor told him, or could be sent to jail indefinitely in the event of a refusal.

These four statutes were passed in the interest of sound public policy. It is highly improbable that the legislature intended to repeal them as to the two kinds of prosecutions mentioned in sec. 4078*d.* While these offenses are serious, only one of them is made a felony by statute. It seems incongruous to close the mouths of certain persons to whom confidential communications are made in cases involving such heinous crimes as first-degree murder, rape, and others that grade above second-degree manslaughter, while as to one offense coming under the latter degree of homicide and one

misdemeanor there is no immunity whatever. No special reason is apparent why these statutes should be repealed as to crimes mentioned in sec. 4078*d*. The necessity for removing the privileges referred to in order to secure a conviction is no greater in the cases covered in sec. 4078*d* than in many other cases. It surely is no greater than it would be in a prosecution against a physician for administering poison which was intended to and did produce death.

Proper effect must be given to the statute, because it was designed to accomplish some purpose. I think its purpose is quite manifest. Abortions are for the most part resorted to where pregnancy results from illicit intercourse. The man in the case often furnishes the money for the operation and secures the services of the person who is to perform the abortion. By doing so he becomes a criminal, but nevertheless his evidence may be essential to secure a conviction of the party performing the operation where death results therefrom. So he is compelled to testify, but when he does so is necessarily afforded immunity from prosecution for the crime which he has committed. So the woman may be compelled to testify where the operation does not result in death, but she, too, is thereafter exempt from prosecution for her participation in the crime which she was compelled to disclose. So too any one who counsels, aids, abets, or advises the commission of the offenses defined by secs. 4352 and 4583, Stats., may be compelled to testify in a prosecution against the party who administers the drug or performs the operation designed to produce a miscarriage, but he cannot thereafter be prosecuted criminally.

I think the purpose of sec. 4078*d*, Stats., was to secure the evidence of parties who might themselves be guilty of criminal conduct, in order to convict the person who actually performed the abortion. The immunity provision contained therein would indicate that such was its purpose. Drs. Dean and Donovan needed no immunity because they had com-

mitted no offense. The object of this clause was to preclude guilty parties from concealing a crime or shielding an abortionist by hiding behind their constitutional privilege to decline to testify to anything that would tend to incriminate them. Of course the legislature might go farther, and the court holds that it has done so. I believe, however, that if the legislature had intended to repeal the four statutes referred to in so far as they pertained to prosecutions under secs. 4352 and 4583, Stats. (1898), some express reference would have been made to them.

I am clearly of the opinion that sec. 4075, Stats., as amended by ch. 322, Laws of 1911, applies to criminal as well as to civil cases. Some doubt is expressed in *Smits v. State,* 145 Wis. 601, 130 N. W. 525, as to whether sec. 4075 as it originally stood applied to criminal actions. The statute in terms applied to all cases, and it would be difficult to find satisfactory reasons for limiting its application to civil cases only. Whatever doubt might arise under sec. 4075 before the amendment, there is hardly room for any since. The court leaves this question open because it was not found necessary to decide it. It is necessary for me to allude to it, however, because if I reached the conclusion that the statute had no application to criminal cases, I could see my way clear to vote to sustain the conviction. The portion of ch. 322, Laws of 1911, not quoted in the opinion of the court, reads as follows:

"But as a witness in his own behalf, he may disclose such information in any civil action brought by such patient or his legal representatives to recover damages for malpractice in such professional attendance, and also in any criminal prosecution for such malpractice, whenever such patient or his legal representatives shall have first given evidence relating to such information."

It will be seen that this statute expressly provides that in one class of criminal cases the physician may testify. There

could hardly be a much stronger expression of legislative purpose to have the statute apply to criminal cases generally. The physician is precluded from testifying in all cases except in a civil action against him for malpractice and in a criminal prosecution for malpractice where the patient or her representatives shall have given evidence relating to the information communicated to the doctor. Surely if the legislature conceived that it was enacting a statute that applied to civil cases only, it would not except a single kind of a criminal prosecution from its operation. It is just as certain that the words of the statute cover all actions whether civil or criminal.

I have not deemed it necessary to discuss the prejudicial character of the evidence of Drs. Dean and Donovan, if the witnesses were incompetent, because it is not suggested in the opinion that the evidence which they gave would not be prejudicial if it was erroneously received. I do not understand that there is any difference of opinion on this proposition among the members of the court.

Because I think prejudicial error was committed in receiving this evidence, I am of the opinion that a new trial should be ordered.

I have been requested by Mr. Justice SIEBECKER to say that he concurs in this opinion.

The following opinion was filed September 20, 1912:

TIMLIN, J. Counsel for accused, on motion for rehearing, present that this court erred (1) in ruling that the dying declarations were admissible; (2) in ruling that the jury was properly allowed to pass upon the mental capacity of the declarant to make such declaration; (3) in ruling that there was not evidence of any coercion or persuasion sufficient as matter of law to render incompetent the dying declarations; and (4) in receiving the testimony of Drs. Dean and

Donovan. This is substantially presenting for the second time the arguments which failed to convince us at the first hearing. While this calls for reconsideration, when a motion so supported is denied the denial is usually accompanied by no written opinion. In deference, however, to the very earnest, courteous, and learned presentation of the matter, it may not be amiss to state that we have reconsidered the questions presented and find no reason to recede from the former opinion in the case.

If the admissibility of dying declarations was governed by the rules of law relating to confessions of guilt there would be great force in the arguments of counsel. There are, however, fundamental differences. An inducement to confess is an inducement to accuse oneself of crime. An inducement to make a dying declaration is not an inducement to accuse any one of crime. Confession is admissible as a declaration against interest in all cases and carries with it all relevant evidence therein contained. A dying declaration is admissible only in cases of homicide (*State v. Dickinson,* 41 Wis. 299), and only so far as it purports to give facts and circumstances under which the mortal injury was inflicted or identifies the person who inflicted the same. It is only admissible when made by the declarant under a sense of impending death from such injury, and the rule admitting the declarations had its origin in the necessities of the case and in the belief that under such circumstances there would exist no inducement to falsify and no reason for falsification. Unlike a forced confession, it in no degree impinges upon the constitutional rule that no person should be compelled to be a witness against himself, although it has been considered seriously with reference to that other constitutional provision which gives the accused the right to confront the witnesses against him (sec. 7, art. I). The whole subject will be found treated in Wharton, Crim. Ev. (9th ed.) §§ 276, 304; 4 Ency. of Ev. 910; Dec. Dig. ABORTION, § 10, HOMICIDE,

§§ 200 to 221.   By using the key number of that digest the investigator will be enabled to bring the subject down through the American Digest to the present time.   In several of the cases the subject of dying declarations made in response to leading questions is considered and some of the precedents go very far in support of their admissibility.   Without here going to the length of these cases, suffice it to say that no reasonable request for a statement of the circumstances under which a mortal injury was inflicted and no reasonable or proper insistence upon such statement, where such insistence is essential to diagnosis by a physician or as a protection against prosecution, will be sufficient to exclude a dying dec-laration.   The insistence here was of this character.   Dying declarations are made by one under a sense of impending death, not in the interest of the declarant, but theoretically at least in the interest of vindicating the law or of protecting innocent persons who might be wrongfully accused, and such declarations must possess the general characteristics of *res gestæ,* although more remote in time than what would be or-dinarily admissible as *res gestæ.*   It would be most illogical to admit their competence on other grounds but refuse to re-ceive them in evidence because the making of a declaration was suggested by one who had proper grounds for making the suggestion.

We are unable to come to any conclusion which would change our former opinion with reference to the admissibility of the testimony of Drs. Dean and Donovan.   The learned attorney general calls our attention here to the amendment made by sec. 44, ch. 664, Laws of 1911.   We are also satis-fied with the construction heretofore given sec. 4078*d,* Stats. (Laws of 1905, ch. 149).

The case is not before us upon review of an order denying a motion for a new trial.   Some of the evidence relative to the presence of older lesions about the ovaries or Fallopian tubes and the presence of connective tissue tends to cast some

doubt upon the origin of the peritonitis which resulted in death. The testimony relative to the probable age of this connective tissue is not very satisfactory. This decision in no way prevents the making and consideration of a motion for new trial in the trial court under sec. 4719, Stats. (1898). If such a motion be made, additional light may perhaps be thrown on the subject of the origin of the peritonitis.