SCHLESAK, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 15—October 10, 1939.*

The cause was submitted for the plaintiff in error on the brief of *Eugene J. Sullivan,* attorney, and *Roland J. Steinle* and *Bruce B. F. Randolph* of counsel, all of Milwaukee, and for the defendant in error on that of the *Attorney General, Herbert J. Steffes,* district attorney of Milwaukee county, and *Andrew W. Brunhart,* assistant district attorney.

NELSON, J. The information in substance charged that on April 10, 1938, the defendant feloniously performed an operation upon Lucy Mente, a pregnant woman, with the intent to produce an abortion, which operation produced the death of Lucy Mente on May 29, 1938, at the county of

Milwaukee in the state of Wisconsin. Upon the coming in of the verdict, and before sentence, the defendant moved that she be discharged for the reason that there was no credible evidence in the record to support the verdict of guilty, and for the further reason that the state had failed to prove her guilty of the crime charged beyond a reasonable doubt. The defendant also moved for a new trial upon the same grounds. The defendant assigns as errors the refusal of the court to set aside the verdict and discharge the defendant and the refusal of the court to grant a new trial.

The defendant contends that there is no credible evidence to support the verdict. That contention requires a review of the material facts adduced by the state.

On April 10, 1938, Lucy Mente, hereinafter called the "deceased," resided with her husband at 1227 South Fifteenth street in the city of Milwaukee. She was thirty-eight years of age, and the mother of four children, aged, respectively, eighteen, eleven, nine, and seven years. On April 10, 1938, she was pregnant but did not desire to have another child. On April 10th, after supper, she and her husband, Jacob Mente, went to the home of the defendant located at 3955 West Bluemound road. The defendant was a registered midwife who for many years had practiced midwifery in Milwaukee county. Her husband operated a tavern at the same location. The tavern was on the ground floor. The defendant's living quarters were in the basement under the tavern.

Jacob Mente testified that he and the deceased went to the tavern on April 10, 1938, which was Palm Sunday, and arrived there shortly after 7 o'clock; that he went there for the purpose of having an abortion operation performed upon his wife; that when they entered the tavern, Mr. Schlesak, the husband of the defendant, was behind the bar; that he asked for the defendant; that after having served them beer, Mr. Schlesak said that he would call her; that he did call her and

that she came up into the barroom; that the defendant then said "we should follow her downstairs," which he and the deceased did; that he asked the defendant if he should wait downstairs or upstairs, and that she replied "upstairs;" that he paid her $25, and that she asked him to put his name and address on a piece of scrap paper that she had there; that he then went upstairs and waited in the barroom for about three-quarters of an hour; that at the end of that time the defendant and the deceased came upstairs, and the deceased said to him in the presence of the defendant: "We're all through;" that a taxi was called and they returned to their home; that upon arriving home the deceased went to bed; that he did not see the defendant again until Saturday, the 16th of April; that during the week the deceased got worse; that on Saturday evening he could see that the deceased was very ill; that about 11:30 p. m. he tried to get a certain doctor to come to his home to treat the deceased; that the doctor refused to come; that close to midnight he had someone call the defendant; that a car belonging to a friend was dispatched to convey the defendant to his home; that the defendant came; that shortly after arriving she went into the kitchen and thereafter appeared with certain instruments in her hand; that she went into the bedroom where the deceased was and closed the door behind her; that she was in there about fifteen minutes; that during the time the defendant was in the bedroom the deceased screamed; that the defendant came out of the bedroom and, after procuring some warm water, asked him to assist her in giving the deceased an enema.

On Monday, April 18, 1938, the deceased was taken to the Milwaukee county general hospital. The next morning her condition, in the opinion of a hospital doctor, was critical. At 6 o'clock in the morning she was given a hypodermic of morphine. A priest, who was thereafter called, arrived at the bedside of the deceased shortly after 8 o'clock. He heard

her confession and gave her the last sacrament in accordance with the rites of the Roman Catholic church. Fr. Dennert, the priest, testified that the deceased realized that she was very sick. The district attorney's office was notified of the critical condition of the deceased, and John Zilavy, detective, and Roy Bethke, reporter, went to the hospital for the purpose of obtaining a statement from the deceased. Questions were propounded to the deceased by Mr. Zilavy, in the presence of Mr. Bethke and a Mrs. Bechtel, which she answered. Mr. Bethke took down the questions and answers in shorthand and thereafter made a typewritten transcript thereof, consisting of about seven and a half pages. The deceased, after answering a number of questions as to her name, age, husband's name, children, and their ages, etc., was asked the following questions:

"*Q.* You realize you are in a serious condition, don't you? *A.* Yes.

"*Q.* And you want to make a true statement at this time? You want to tell me the truth about your condition? *A.* They take that away, about the baby, I was there once.

"*Q.* Who did that? *A.* Midwife.

"*Q.* And how long were you pregnant? *A.* Oh, about three months.

"*Q.* You realize that you are in a very serious condition and about to die and you wish to make a true statement, is that right? *A.* Yes."

The deceased then stated, in substance, that she had gone to this midwife on Palm Sunday; that she had told her that she was pregnant; that the name of the midwife was Mary Schlesak; that the latter lived at 3955 West Bluemound road; that she charged $25 for the operation; that the defendant did not want to do it but that she begged her to do it; that the operation was performed "*at her home*" in the evening of Palm Sunday in her bedroom; that the operation was performed with instruments which she described; that the defendant came to her home on Tuesday night and again did the same thing; that on Tuesday night the foetus passed.

After the statement of the deceased was taken a statement was taken from Mr. Mente, who was in the hospital. He stated that the operation was performed at the home of the defendant. The persons who had taken the deceased's statement then went back into her room and asked the following questions:

"*Q.* Mrs. Mente, I understood you to say before when I talked to you that the first time this woman did the operation on you it was on Palm Sunday? *A.* Yes.

"*Q.* And I understood you to say that it took place at your home about 9 o'clock in the evening. It didn't take place at your home? *A.* No.

"*Q.* Where did it take place? *A.* By her home.

"*Q.* Then after that she came to your home, is that right? *A.* Yes, she come home on Tuesday first."

Louise Benauer, sixteen years of age, a niece of the deceased, testified that she took care of the deceased from Monday, April 11th, until Friday night, April 15th; that she saw the defendant at the Mente home on Tuesday, April 12th, and that the defendant at that time asked for hot water and went into the deceased's room; that she saw the defendant again on Friday, and at that time the defendant asked for hot water and went into the deceased's room; that on Wednesday of that week the deceased called her and said:

"It is coming and I can't help it, you will have to see it;"

that she thereafter saw the foetus, which she fully described. The foetus was also seen by Jacob Mente, the husband, and by another witness, both of whom described its size and appearance.

Shortly after the statement was taken by Mr. Zilavy, Fr. Dennert again saw the deceased and conversed with her. This was about an hour and a half after he had given her the last sacrament. He testified that the essence of what the deceased said at that time was that she was very sick and that she had to die now. In the days which followed, the deceased's condition seems to have become somewhat less

critical and she lived until May 29, 1938. A post-mortem examination was conducted by Dr. Tharinger on May 30th. He testified that in his opinion death was caused by peritonitis, the result of abortion. He testified, among other things, that there was a channel in the cervix of the uterus which could have been caused by an instrument.

The defendant testified that the only time she saw the deceased was on Saturday night, April 16th, or early Sunday morning, when she was called to the deceased's home; that all she did at that time was to give the deceased an enema; that she had not performed an operation upon the deceased; that she had not used instruments upon her body; that she was not at home on Palm Sunday, April 10th, between about 3:30 and 9:30 o'clock p. m.; that during those hours she and her husband were visiting their daughter and son-in-law who resided north of Milwaukee, about seventeen miles from her home. She was corroborated by her daughter, Mrs. Otto, by her son-in-law, Mr. Otto, both of whom testified that the defendant and her husband came to their home between 4 and 5 o'clock in the afternoon on Palm Sunday and remained there until after 9 o'clock that night. The absence of the defendant and her husband from the tavern and their home during the hours mentioned was also testified to by another daughter, who stated that she was left in charge of the tavern during the absence of the defendant and her husband on that Sunday. A grandchild, seventeen or eighteen years of age, testified that he took the defendant and her husband to the Otto home during the afternoon but did not stay there very long. The defendant and her husband, her daughter, Mrs. Otto, and her son-in-law, testified that the Ottos brought the defendant and her husband back to their home after Otto's butcher shop was closed at 9 o'clock that night.

The contention of the defendant that the evidence adduced upon the trial was insufficient to prove the defendant guilty beyond a reasonable doubt, and the contention that the court erred in refusing to set aside the verdict and discharge the

defendant, requires this court to express its considerate and deliberate opinion and judgment upon the question of the sufficiency of the evidence to prove the defendant guilty beyond a reasonable doubt. It has often been held by this court that a defendant, who has been convicted of a crime, is entitled to the solemn and deliberate judgment of this court, and each member thereof, on the question whether his guilt was sufficiently proven. In *Parke v. State,* 204 Wis. 443, 444, 235 N. W. 775, our prior decisions were reviewed and the right of convicted defendants to the solemn and deliberate judgment of this court was discussed. It was there said:

"This right of a defendant who has been convicted of a crime, after due and proper trial, is clearly established. This right, however, is to the solemn and deliberate judgment of this court and each member thereof, on the question whether his guilt *was* sufficiently proven. In other words, he has the right to demand of this court its solemn and deliberate judgment on the question whether there was adduced upon his trial evidence which, if believed by the jury and rationally considered, was sufficient to prove his guilt beyond a reasonable doubt. This is the extent of this right and the extent of our solemn duty. A defendant has no right to demand that this court and every member thereof be affirmatively convinced of his guilt beyond a reasonable doubt. An appellate court cannot, for obvious reasons, properly function as a trial court or as a jury. When there is a conflict of evidence the weight thereof is for the determination of the jury."

The contentions of the defendant are based largely upon the following assertions: (1) No witness actually saw the defendant perform an operation upon the deceased; (2) in view of the alibi evidence, which tended to show that the deceased was not at her home on the evening of April 10, 1938, the testimony of Jacob Mente was untrue and was so discredited as to render it incredible; (3) the so-called dying declaration of the deceased was not properly admitted as evidence because at the time she gave it she was in a semicon-

scious condition as a result of the morphine hypodermic which had been given to her at 6 o'clock that morning, and because she was not, in fact, *in extremis;* (4) the defendant's testimony was corroborated in every essential detail; (5) the defendant, from the very beginning, always maintained that she was innocent.

It is true that no witness testified to having actually seen the defendant perform an operation upon the deceased. However, it is not necessary to prove by direct evidence that such an operation was performed. That fact, like other facts, was properly proved by circumstantial evidence.

The evidence is undisputed that the deceased, at 6 o'clock in the morning of April 19th, was given a hypodermic consisting of a quarter of a grain of morphine, and that such dosage would render her drowsy for a time until the effects of the drug wore off. Four witnesses, including Fr. Dennert, testified that from 8:15 o'clock on she was conscious and understood the questions asked her, and that she made intelligent answers to them. Certainly the testimony of these witnesses clearly permitted the jury to believe that at the time the statement was made by her she was in a condition which permitted her to converse intelligently, to understand questions asked her, and to make intelligent replies thereto. True, there was a discrepancy between the first statement made by her and the supplemental statement made by her regarding the place of the operation. That inconsistency, however, did not render the statement inadmissible. The jury might consider the inconsistency and discredit the statement, but the inconsistency did not require that the statement be excluded. *Richards v. State,* 82 Wis. 172, 51 N. W. 652.

It appears without dispute that at 6 o'clock in the morning of April 19th the deceased was considered by Dr. Schwartz and a nurse to be in a critical condition. They did not, however, inform the deceased that she was in such condition. She obviously knew that she was very sick. She had been

very sick at her home and had been taken to the hospital. She made her confession and received the last sacrament of her church, which must have induced the belief on her part that she was in a critical condition. She told Fr. Dennert, when he saw her the first time, that she was very sick, and an hour and a half later she told him that she was very sick and had to die now. She was asked by Mr. Zilavy if she did not realize that she was in a serious condition and she answered "Yes," and if she did not realize that she was in a very serious condition and about to die and she answered "Yes." It cannot be seriously doubted that the evidence was sufficient to fully satisfy the law regarding dying declarations. *State v. Martin,* 30 Wis. 216; *State v. Dickinson,* 41 Wis. 299; *Richards v. State, supra; Hughes v. State,* 109 Wis. 397, 85 N. W. 333; *State v. Law,* 150 Wis. 313, 136 N. W. 803, 137 N. W. 457; *Oehler v. State,* 202 Wis. 530, 232 N. W. 866; *Pollack v. State,* 215 Wis. 200, 253 N. W. 560, 254 N. W. 471.

When testimony regarding the dying declaration was first offered, objection to its admission in evidence was promptly made. The court thereupon excused the jury and gave painstaking consideration to the circumstances surrounding the making of the statement, and by and with the consent of the district attorney and the defendant's attorney, eliminated from the statement all incompetent, irrelevant, and immaterial portions thereof. This procedure was proper and the course pursued was in accordance with the suggestion made in *Oehler v. State, supra.* After full consideration, the court was of the opinion that the witnesses who heard the statement might testify to such parts thereof as were not objectionable, permitting the witnesses to refresh their memories by consulting the transcript. The court instructed the jury fully as to the law applicable to dying declarations. The instructions given were practically identical with those given the approval of this court in *State v. Law, supra.* In that

case the instructions given by Judge Stevens were regarded as so fair, full, and accurate as to merit preservation in our Reports.

The defendant testified that she was not at home on April 10th, Palm Sunday, at the time the state asserted that the operation was performed, and in that regard she was corroborated by her husband, her two daughters, and her son-in-law. Their testimony, however, was in no sense conclusive and obviously was not considered by any of the jurors as sufficiently credible to raise a reasonable doubt as to her guilt.

The defendant, of course, maintained her innocence from the outset, but such course of conduct on her part did not preclude the jury from being convinced beyond a reasonable doubt of her guilt.

After a careful review of all of the evidence which the long record in this case contains, it is our deliberate opinion and solemn judgment that the evidence adduced by the state, if deemed credible by the jury, amply supports its verdict. The defendant was represented by able counsel, who cross-examined all of the state's witnesses at length, and meticulously brought out any and every inconsistency between their testimony upon the trial and that given by them at the coroner's inquest and the preliminary examination. The record reveals that the court throughout the trial was exceedingly cautious in its rulings and quite liberal to the defendant. No error is suggested in any of the court's rulings except that of admitting the dying declaration and no criticism of the instructions given is suggested. The credibility of the witnesses and the weight of the evidence were of course for the jury. *Parke v. State, supra; State v. Hintz,* 200 Wis. 636, 229 N. W. 54.

*By the Court,*—Judgment affirmed.