## COMMONWEALTH *vs.* ANNIE A. M. BREWER.

Essex.    November 6, 1895. — November 27, 1895.

Present: FIELD, C. J., HOLMES, KNOWLTON, MORTON, & LATHROP, JJ.

*Manslaughter — Evidence — Dying Declarations — Admissibility of Evidence depending upon a Collateral Fact.*

At the trial of an indictment for manslaughter by shooting, even if the exclusion of the question to the defendant by her counsel, "In October did you have a miscarriage?" was wrong, in the absence of an offer to connect the fact with the defendant's condition in the middle of December, when the shooting occurred, it may be cured by afterwards allowing her to testify that on the day of the shooting she was suffering from the effects of a miscarriage, and was weakened by reason of it.

At the trial of an indictment for manslaughter the exclusion of a question put to a

witness of the defendant whether there was a change in the habits of the deceased with reference to drinking between October 20 and December 13, upon which latter day the defendant shot him, does the defendant no harm if she is allowed to prove his condition on that day.

At the trial of an indictment for manslaughter the defendant was allowed to testify that she had been pregnant by the deceased, and her testimony was not controverted by the government. *Held*, that the exclusion of evidence that she had made a similar statement *in pais* did her no harm, even assuming that the facts were such as to take the evidence out of the general rule against hearsay.

Dying declarations are admissible, if the evidence is clear that they were made under a sense of impending death.

When the admissibility of evidence depends upon a collateral fact, the regular course is for the judge to pass upon the fact in the first instance, and then, if he admits the evidence, to instruct the jury to exclude it if they should be of a different opinion on the preliminary matter.

INDICTMENT, for the manslaughter of Gideon W. Lattimer, on December 13, 1894, at Lynn. At the trial in the Superior Court, before *Gaskill*, J., the following facts were not in dispute.

Lattimer was a single man, and the defendant was a single woman. For some months before December 13, 1894, an engagement of marriage had existed between Lattimer and the defendant, and there had been illicit relations between them. On the morning of December 13, 1894, Lattimer called at a house in Lynn where the defendant lived, met her at the exterior door and went with her to a chamber in the house, where they were alone for a short time. A revolver which had formerly belonged to Lattimer was in a bureau drawer in the chamber, in the possession of the defendant. During the interview between them three shots were discharged from a revolver, which was there held in the defendant's hands, the first of which inflicted a mortal wound in the abdomen of Lattimer. Of the other two shots, one took effect in the shoulder of Lattimer, and the other was buried in a panel of the outside door of the house. Lattimer died of the mortal wound on December 15, 1894, at about nine o'clock in the evening. The Commonwealth contended that each of the three shots was fired by the defendant with the intention of inflicting injury upon Lattimer, and that the account given by Lattimer in his dying declaration, hereinafter contained, was substantially true. The defendant contended, and testified in her own behalf, that Lattimer assaulted her, threw her on a bed and was choking her, when she pulled the revolver, which she had previously given to him

in the room, from his pocket, and took it into her hand for the purpose of protecting herself from violence, and that in the struggle the shot which inflicted the mortal wound and the second shot were accidentally fired, and that the third shot was fired by her in the belief that it was necessary for her own defence.

The defendant testified, without objection, that between July and November, 1894, she was twice pregnant by Lattimer   She was then asked by her counsel the question, " In October did you have a miscarriage ? " which, upon objection by the government, was excluded, and the defendant duly excepted.   The defendant subsequently was permitted to testify, without objection, that on the day of the shooting she was suffering from the effects of a miscarriage, and was weakened thereby.

There was testimony on behalf of the defendant in respect to the strength and physical appearance of Lattimer and his characteristics of temper.   The defendant testified that on December 13, when Lattimer called upon her, he was under the influence of liquor, and that she smelled liquor in his breath. The defendant called a witness and asked him the following question : " Was there a change in his (Lattimer's) habits with reference to drinking from on or about October 20 to December 13 ? "   Upon objection by the government, this question was excluded, and the defendant duly excepted.   The defendant was permitted to introduce testimony upon the condition of Lattimer with respect to drink upon the day of the homicide.

The defendant called a witness, who testified that she was at the head of a lying-in hospital in Lynn, and that in the latter part of November, 1894, the defendant called at that hospital with a man unknown to the witness.   The witness was then asked the following question : " Did you know from any talk with her that she was in a family way ? "   Upon objection by the government the question was excluded, and the defendant duly excepted.   The government did not attempt to controvert the defendant's claim that she was pregnant by Lattimer.

The government introduced testimony that, at about four o'clock in the afternoon of December 15, the following conversation occurred between Lattimer and the persons hereinafter named.   Dr. Stevens, the attending physician, said to him, " It

becomes my duty to tell you that there is no chance for you to recover." Dr. Pinkham, a consulting physician, also said to Lattimer, " There is no chance." Dr. Stevens said, " There is no other way." Lattimer said, " Oh, my God, must I die ! " It was not regarded as a question, but as an exclamation, by the physicians, as Dr. Pinkham testified without objection. Frank E. Wells, city marshal of Lynn, then said, " Now, Lattimer, you know your condition as the doctors have told you, and I want you to tell me what happened to you, where it occurred, and all about it." Lattimer then proceeded to make a statement in reference to the cause of his injuries, which was reduced to writing as it was made. The statement was then read to him, and the city marshal said, " Now, Lattimer, knowing your condition, as the doctors have told you, is this statement true?" Lattimer replied, " It is true, so help me God." While making this statement Lattimer asked for water, saying, " Give me some water, if I have got to die."

The government was then permitted, against the objection and under the exception of the defendant, to put in evidence the statement, which was as follows:

" It occurred at 13 Bond Street. I went down there to return what things I had belonging to her. She asked me upstairs. She wanted me to sit down. I said, ' No, anything you want to say to me, say it now '; she had a ring in her hand and said, ' Won't you take some little thing to remember me by ? ' I said, ' No.' She went to the drawer, as I supposed after some little thing, and must have taken the revolver from the drawer. I did n't know it, and she put it against my breast and fired. She held it in both hands so that I could not see it."

*Inspector Rowe.* " Who fired the shot? *A.* Maud Brewer. No one else."

*Marshal.* " Did you touch her before that? *A.* No.

" *Q.* Did you have that revolver in your possession ? *A.* No, I did not.

" *Q.* Did you have any revolver in your possession that day ? *A.* No, I did not."

*Inspector Rowe.* " Were all three shots fired in that room ? *A.* No sir. One was fired in the room ; that one struck me in the bowels. The one that struck me in the back was fired just

as I turned to leave the room. The third one was fired when I was standing at the foot of the stairs, when I was trying to unfasten the front door. The revolver which she had I left at her house on Brownville Avenue some two months ago. I left it lying on the table, and neglected to take it away with me when I went."

The defendant's objection to the admission of this testimony was, that it did not sufficiently appear that Lattimer believed himself to be in a dying condition. The jury were instructed by the judge as follows:

" You are not to consider the statement of Lattimer which was put in evidence by the Commonwealth, unless you are satisfied beyond a reasonable doubt that, at the time Lattimer made that statement, he believed that there was no hope of life. It is argued that the expression of Lattimer, " Oh, my God, must I die?" was an inquiry, and indicated a hope of recovery. If you are satisfied that there existed a hope, belief, or expectancy, or a lingering chance still for life, as viewed by Lattimer, then you are not to consider that statement, and it should be excluded."

The case was submitted to the jury under appropriate instructions, not excepted *to,* and they returned a verdict of guilty. The defendant alleged exceptions.

*J. H. Sisk,* for the defendant.

*W. H. Moody,* District Attorney, for the Commonwealth.

HOLMES, J.   1. If the exclusion of the question to the defendant, " In October did you have a miscarriage?" was wrong, which we do not intimate, in the absence of an offer to connect the fact with the defendant's condition in the middle of December, it was cured by afterwards allowing her to testify that on the day of the shooting she was suffering from the effects of a miscarriage, and was weakened by reason of it.

2. The question whether there was a change in Lattimer's habits with reference to drinking between October 20 and December 13 was immaterial. The defendant was allowed to prove his condition on the day when she shot him.

3. The defendant was allowed to testify that she had been pregnant by Lattimer, and her testimony was not controverted by the government. Under these circumstances, the exclusion

of evidence that she had made a similar statement *in pais* did her no harm, even assuming that the facts were such as to take the evidence out of the general rule against hearsay. This exception was not argued.

4. The dying declarations of Lattimer were admissible. The evidence was clear that they were made under a sense of impending death. Just before they were made, both the attending doctors had told Lattimer that there was no chance of his recovering. His exclamation in answer, " Oh, my God, must I die ! " and his later request, " Give me some water, if I have got to die," imply an acceptance of the fact. The rebellion suggested by the words is not against the truth, but against the hardship of the fact. The judge by admitting the evidence impliedly found that Lattimer believed what the doctors told him. If it were true, as the defendant argues, that it was wrong to let the jury revise the judge's preliminary finding, without which he could not have admitted the evidence, the defendant did not suffer, but on the contrary was allowed a second chance of getting the evidence excluded, — a chance of which her counsel seems to have availed himself by arguing that Lattimer's words expressed a hope of recovery. But the course adopted was right, and was in accordance with the settled practice. When the admissibility of evidence depends upon a collateral fact, the regular course is for the judge to pass upon the fact in the first instance, and then, if he admits the evidence, to instruct the jury to exclude it if they should be of a different opinion on the preliminary matter. *Commonwealth* v. *Preece*, 140 Mass. 276, 277. *Commonwealth* v. *Robinson*, 146 Mass. 571, 580 *et seq.*

*Exceptions overruled.*