## STATE v. McNAIR.

No. 3243.   Decided Dec. 17, 1918.   (178 Pac. 48.)

1. CRIMINAL LAW—APPEALS—ABANDONMENT OF EXCEPTIONS. In prosecution for murder, timely objections made and exceptions taken to the admission of deceased's dying declaration are abandoned where the ruling of the court is not assigned as error, and the matter is not referred to by counsel in the brief.   (Page 107.)

2. HOMICIDE—EVIDENCE—DYING DECLARATIONS—CONSCIOUSNESS OF APPROACHING DEATH. Evidence *held* to show that deceased, who made statement with regard to defendant's having shot him, fully appreciated that his wounds were fatal, and that he would soon die because of them.   (Page 107.)

3. HOMICIDE — EVIDENCE — DYING DECLARATIONS—CONSCIOUSNESS OF APPROACHING DEATH. The admissibility of dying declarations in prosecution for homicide does not depend upon any particular form of expression, but it depends upon the view which deceased took of his own case when in imminent danger of death.   (Page 108.)

4. HOMICIDE—EVIDENCE—"DYING DECLARATION"—STATEMENT AS TO PROVOCATION. Deceased's statement, when made under the conscious sense of impending death, to the effect that accused shot him without provocation, is admissible as a dying declaration.   (Page 109.)

5. HOMICIDE—HARMLESS ERROR—DYING DECLARATION. In prosecution for murder, error, if any, in admission of deceased's statement that accused shot him without provocation, was not prejudi-

cial, where in deceased's dying declaration all the facts were stated, and they showed conclusively that there was no provocation. (Page 109.)

6. HOMICIDE—INSTRUCTIONS—DEGREE OF MURDER. In prosecution for murder, instruction requiring conviction of lesser degree, if jury was in doubt as to what degree should be found, "if it shall appear that defendant committed a public offense," was not objectionable as authorizing conviction of any public offense, though not included in the offense charged. (Page 110.)

7. HOMICIDE—HARMLESS ERROR—INSTRUCTIONS. In prosecution for murder, instruction requiring conviction of lesser degree, if jury was in doubt as to what degree should be found, "if it shall appear that defendant committed a public offense," if erroneous as authorizing a conviction of any public offense, though not charged in the indictment, did not mislead jury, where verdict specifically found accused guilty of murder as charged in the indictment. (Page 110.)

Appeal from the District Court of Salt Lake County, Third District; *Hon. J. Louis Brown*, Judge.

William O. McNair was convicted of murder in the second degree, and he appeals.

AFFIRMED.

*Carlson & Carlson* for appellant.

*Dan B. Shields*, Atty. Gen., and *O. C. Dalby* and *Herbert Van Dam, Jr.*, Asst. Attys. Gen., for the State.

McCARTY, J.

William O. McNair, the defendant, is charged in the information filed by the district attorney in the district court of Salt Lake County with having "willfully, feloniously, unlawfully, premeditatedly, and of his malice aforethought" killed and murdered one Edward T. Williams, of Salt Lake City, Utah, on the 14th day of February, 1917. The defendant was convicted of murder in the second degree, and sentenced to imprisonment in the state prison for a term of 15

years.    To reverse the judgment defendant prosecutes this appeal.

It is conceded that McNair shot and killed Williams at the place and on the date mentioned in the information.    McNair, however, claims that at the time the shooting occurred, the deceased was in the act of assaulting him with a deadly weapon—a knife—with intent to kill and murder him, and that he killed Williams in self-defense.

The facts and circumstances leading up to and surrounding the commission of the homicide are, as disclosed by the record, as follows: In July, 1916, Juanita Williams, wife of Williams, obtained an interlocutory decree of divorce from him.    Mrs. Williams was given the custody of Lulu Williams, a little girl of about eight years of age, the issue of her marriage with Williams.    It seems that Williams was permitted to occasionally visit and talk with the little girl.    About the time the interlocutory decree of divorce was granted Mrs. Williams rented a few rooms in an apartment house at 123 West North Temple street, Salt Lake City, and took roomers and boarders in order to support herself and child—the little girl mentioned.    Williams called at the house occasionally, apparently for the purpose of visiting with the little girl. The defendant McNair became a roomer at Mrs. Williams' apartments some time in November, 1916, and on or about the 1st day of January, 1917, commenced taking his meals there. A close friendship grew up between Mrs. Williams and Mc-Nair, and the evidence shows that he frequently accompanied Mrs. Williams and the little girl when Mrs. Williams went shopping.    On two or three of these occasions he met Williams, who seemed to object to the friendly relations existing between him and Mrs. Williams, and particularly to the attention that he (McNair) was paying the little girl.    On one occasion, while accompanying Mrs. Williams and the little girl to a picture show, he met Williams, who assaulted him by striking him a heavy blow in the face with his fist.    About February 1, 1917, Mrs. Williams discontinued keeping roomers and boarders, except that McNair, the defendant, remained at her apartments, and moved into the suite of rooms occupied by her and the little girl, which is referred to in the

record as "suite 8." An aged lady, Mrs. Culp, had, in the meantime, moved into a room referred to in the evidence as "room 11," which had been occupied by McNair before he moved into suite 8. It was in this room that the homicide was committed. The day before the homicide (February 13, 1917) Mrs. Williams packed up her things for the purpose, ostensibly, of going to Idaho. One of the witnesses for the state testified that Mrs. Williams stated to her that she and McNair were going to Idaho to be married. This testimony, however, is denied by both Mrs. Williams and McNair. It appears from the evidence that Mr. and Mrs. Kerren moved into room 8 on the same day that Mrs. Williams was packing her effects preparatory to leaving the apartment. During that day (February 13, 1917) at room 8 there was considerable conversation carried on between Mrs. Kerren, Mrs. Williams, and McNair. It appears that McNair was to some extent under the influence of liquor and was somewhat talkative. Mrs. Kerren testified that he on that occasion took from his pocket a revolver and exhibited it to her, and stated that he was going to kill the s—— of a b—— Williams with it, or words to that effect. This testimony is denied by McNair. It appears that Mrs. Williams intended to leave for Idaho on the night train of February 13, 1917, but she missed the train and returned to the apartment. On the following morning, the day of the homicide, after Mrs. Williams and McNair had taken breakfast together, they went into room 11, the room occupied by Mrs. Culp, and remained there until the afternoon, when Mrs. Williams, in company with her stepmother, Mrs. Terrell, left the room to "go uptown." They proceeded down the stairway leading from the room, and when they were in the act of leaving the steps Mrs. Williams slipped and sprained her ankle. Mrs. Williams testified that at the time of the accident Williams, the deceased, came "around from the back of the house"; and after a brief conversation with him, McNair, who appears to have been present, assisted her upstairs and back into room 11 for the purpose of having Mrs. Culp examine her foot, and determine, if possible, the extent of the injury, and that Williams followed them into the room. The testimony of McNair and that given

by Mrs. Williams is to the effect that immediately after they returned to the room Williams and McNair engaged in a heated altercation of considerable length, brought on by Williams abusing and cursing McNair. Regarding what was said and done by Williams and McNair on that occasion Mrs. Williams testified on behalf of defendant, on direct examination, in part as follows:

"Mrs. Culp helped me take my shoe and stocking off. * * * The baby stepped over in front of me, * * * and while she was standing there McNair took hold of her sleeve and said 'Hon.' * * * Mr. Williams cursed him, and told him not to call his child Honey. 'If you call my child Honey again I will kill you.' So Mr. McNair turned around to the child and said, 'That is nothing to call her Honey, is it Babe?' and Williams said (omitting the alleged profanity): 'I am going to kill you. You get your hand on your gun and get it on quick. If you don't get me, I will get you.' * * * He had his pocket knife in his hand, * * * and threw his hand back to his pocket as he made a dash towards Mr. McNair; and Mr. McNair said to him, 'Mr. Williams, I am not looking for trouble; I don't want any.' Mr. Williams said: 'You heard what I said. Get your hand on your gun and get it quick. If you don't get it, I will get you.' He made the second dash towards McNair, and I jumped up from the chair with the intention of grabbing Mr. Williams, as I done before when he was in there—he had threatened so many times, made those threats, I felt if I could get—just get hold of him I could get him quieted down, * * * but I didn't have time. As he made the second dash, Mr. McNair jumped up before I could do it. Two shots were fired. * * * I said, 'My God!' and grabbed for the gun. As I grabbed for the gun it went off again, and Mr. Williams * * * went to make a turn; * * * turned twice around, and then he went down in a heap."

Mrs. Williams further testified that she left the room immediately after the shooting, rushed to a telephone in another part of the building, and summoned a doctor, notified the police department of the homicide, returned to the room where Williams was lying, and as she entered the room— "McNair said to Williams, 'You know I wouldn't have done

this for the world; you know you forced it on me; you know you made me do it; you know you was to blame'; and Mr. Williams said, 'I know I was, and I am sorry.' Mr. McNair asked Mrs. Culp if she heard what Mr. Williams said, and she said no she didn't quite catch it. Then the officers came."

McNair testified in his own behalf at great length, and his testimony, except as to some matters of detail, was substantially the same as that given by Mrs. Williams.

Mrs. Kerren testified that just prior to the homicide Mr. Williams came to her room, which was situated across a hall from the room where the shooting took place, "and asked if Juanita (Mrs. Williams) was there. I said, 'No, sir.' * * * He said he came to bid the little girl good-bye because they were going to Idaho." The witness further testified that immediately after the shots were fired McNair came to her room, knocked on the door, and asked to be admitted; that she refused to open the door to him; that he said, "I told you * * * I would shoot her husband, and I shot the son of a b——."

Mr. Kerren, who at the time was in the room with his wife, testified that McNair on that occasion said, "I told you I would get the woman's husband, and I got the son of a b——."

Mrs. Culp's testimony is to the effect that as soon as Williams entered the room, or immediately thereafter, McNair, without any apparent provocation whatever, drew his gun and shot him down.

Two police officers, Coulson Smith and William A. Pierce, arrived at the scene of the homicide soon after it occurred. Smith was called as a witness by the state, and testified that they arrived there about three o'clock p. m.; that when he entered the room Williams was talking; that two women and McNair "were sort of bending over him"; that he heard Williams say, "All I ask is that you take care of my little girl;" that he asked who shot Williams, and McNair said, "I did." He further testified:

"I asked him why he did it. He said: 'Why, I knew this thing was coming; I felt it all the time. It has been coming for a long time.' I asked him if he was prepared when Wil-

liams came in the room, and he said, 'You bet I was pre-pared.' * * * He told me that he had a fight or some trouble with Mr. Williams in front of the Mehesy Theater, and that Williams had struck him on the nose. * * * He mentioned that several times. That seemed to be one of the main grievances. He told Mr. Pierce in my hearing that he sent to Georgia for the gun.''

That McNair at the time ''appeared to be under the in-fluence of liquor—very close to being intoxicated''; that he examined Mr. Williams' clothes, and ''looked on the floor where he was lying'' for a weapon, but did not find one of any kind; that about 10 minutes after he entered the room he and Pierce put Williams in an automobile and rushed him to the emergency hospital at police headquarters; that on the way to the hospital McNair rode on the front seat with Pierce, and that he and Williams occupied the rear seat of the automobile; that he asked Williams if he was armed, and that Williams answered, ''No; I never carried a gun in my life; I only went down there to bid my little girl good-bye, as they were going away, and this is what I get for it''; that McNair turned around in his seat and said to Williams, ''She is no more your wife than she is mine''; that he did not observe anything that indicated that Williams had been drinking or that he was under the influence of liquor. McNair denied making the remarks and statements attributed to him by Coulson Smith.

The evidence shows that immediately after Williams was taken to the emergency hospital Dr. Keyting made an exami-nation of the gunshot wounds inflicted on Williams, and be-fore he left he told Williams he could not hold out much hope of him recovering from his wounds. About the time the doc-tor was waiting on Williams, Walter W. Little, assistant city attorney, called to see the deceased. Mr. Little was called as a witness by the defendant, and testified that he was in the room with Williams ''just a few minutes''; that he asked him ''whether he realized that he was on his deathbed, or words to that effect, and that Williams made some statement about outliving all his enemies, and that he raised up in bed and said that he would outlive his enemies.'' Soon after Mr.

Little left the room, just how long after does not appear from the record. John S. Corless, sheriff of Salt Lake County, called to see Williams and conversed with him. The sheriff was called as a witness by the state, and testified that Williams said to him that "he knew he was going to die; * * * that McNair shot him without any cause or provocation"; that Williams "seemed to be suffering a great deal of pain from these wounds—seemed to be in great pain"; that "he was conscious and knew what he was talking about." Later, J. Parley White, chief of police of Salt Lake City, called to see Williams, and he testified that Williams stated to him that he "knew he was going to die." The evidence shows that Williams died at six o'clock p. m. the same evening—about three hours after he arrived at the emergency hospital. It seems that, when it became apparent to the officers that Williams would soon die from the effects of the wounds inflicted on him by McNair, he was induced to make a statement of the occurrences at the time of the shooting as he claimed they transpired. The statement was reduced to writing and was signed by Williams. The statement, in so far as material here, is as follows:

"Q. Williams, do you want to make a dying statement as to who shot you? A. Yes. Q. Who shot you? A. W. O. McNair. * * * Q. Are you conscious and know what you are doing? A. I do, absolutely. Q. Did you have a row with him to-day? A. No. Q. Did you threaten to kill him today? A. No. Q. Did you reach back in your pocket for a gun? A. I did not; I was talking to my wife. Osborne (McNair) was then in the room. He turned around and called my little girl 'Honey.' He said, 'Come here, Honey.' I said you can have the woman, but it breaks my heart to have you call my child 'Honey.' He told me to get out of there, that he was running the house. That is all I remember, when I was shot three times, as near as I can remember. * * * Q. You didn't threaten to shoot him? A. No; I told him I wouldn't harm a hair of his head; he was welcome to my wife, but I did roast him for calling my baby 'Honey.' But I did not threaten him. I went up to see my baby and bid her good-bye, not to quarrel with him. * * * Q. Did you

have a gun there today? A. No, sir. * * * Q. You make this statement freely and voluntarily and as a dying declaration? A. Freely and voluntarily before my God in heaven. Q. And you are now in fear of immediate death? A. I am in fear of immediate death. * * * Q. You are perfectly conscious and understand what you are doing, do you? A. I do.''

While timely objections were made and exceptions taken to the admission of the statement in evidence, the ruling of the court thereon is not assigned as error; nor is the matter referred to by counsel in their brief. The objections made and exceptions taken to it at the trial must, therefore, be considered as abandoned.

The testimony of the sheriff respecting the declaration made by Williams to him is assigned as error. The admissibility of the declaration is challenged on two grounds: First, it is contended that it was not shown that it was made under the sense of impending death; and, second, that it was a statement of a mere conclusion and not one of fact.

We think the only conclusion permissible from the evidence is that Williams at the time he made the statement fully appreciated that the wounds he had received were fatal, and that he knew he would soon die because of them. The evidence shows that at the time the statements were made he was very weak and was suffering intense pain. The evidence of Little that Williams stated to him that he would outlive his enemies is not necessarily in conflict with that given by the sheriff and the chief of police. The record shows that Little conversed with him soon after—almost immediately after—he arrived at the emergency hospital. At that time Williams may have believed there was a chance for him to recover. The evidence shows, however, that later on he gave up all hope of recovery, and became convinced that he could not long survive, and that he was in that state of mind when he talked with Sheriff Corless.

In the case of *Commonwealth* v. *Brewer*, 164 Mass. 577, 42 N. E. 92, the court said:

''The dying declarations of Latimer were admissible. The evidence was clear that they were made under a sense of impending death. Just

before they were made both the attending doctors had told Latimer that there was no chance of him recovering. His exclamation in answer, 'Oh, my God, must I die!' and his later request, 'Give me some water, if I have got to die,' imply an acceptance of the fact.''

In *Titus* v. *State*, 117 Ala. 16, 23 South. 77, the court said:

"The declarations, reduced to writing as dying declarations, were properly admitted. He stated that 'he believed he would soon die.' The physician who attended him said that the 'deceased was very low, and that he did not think he would live many hours.' ''

These cases are cited by counsel for appellant in support of their contention that the evidence in the case at bar was not sufficient to show that the declarations made by Williams were made under the conviction on his part that he was about to die. The evidence of the sheriff, however, is that Williams stated he "knew he was going to die." We think the only fair conclusion permissible from this statement, considered in connection with the circumstances and conditions under which it was made, is that deceased was convinced that he was about to die from the effects of the gunshot wounds he had received. The evidence that the deceased had a conscious sense of impending death when he made the declarations referred to is stronger and more convincing than it was in either of the cases above cited.

The rule, we think, is correctly stated by the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Roberts*, 108 Mass. 296, as follows:

"The admissibility of such declarations does not depend upon any particular forms of expression, for these will vary indefinitely, but it depends upon the view which the deceased took of his own case when in imminent danger of death.''

We think that under the circumstances the preliminary proof—the evidence of the state of mind the deceased was in respecting the fatal character of his wounds and his conviction that he could not long survive—was amply sufficient to authorize the admission in evidence of the declarations, provided they were otherwise competent. Wharton, Crim. Ev. (9th Ed.) section 284.

There is a conflict of authority respecting the admissibility of a statement by a victim of a homicide that the act

was committed without provocation. We think the       4
weight of recent authority, and the better rule, is that
such statement, when made under the conscious sense of im-
pending death, is admissible as a dying declaration.

In Wharton on Homicide, section 629, the author says:

"The prevailing rule is that a declaration that a killing was done
without provocation, or without reason, or for nothing, constitutes a
statement of fact, and is admissible as a dying declaration."

Again, in the same section:

"So, a statement that the shooting was willful and malicious is not
objectionable as a mere statement of opinion, when the testimony tends
to show that there were facts within the knowledge of the deceased upon
which he might have based an opinion to that effect."

In the case at bar the evidence shows that the facts and
circumstances attending the shooting were practically all
known to the deceased, and there is abundant evidence to
the effect that it was without cause or provocation.

In 21 Cyc. 988, it is said:

"A dying declaration by the victim of a homicide that the act was
without provocation, or words of like import, although very general,
is, as a rule, held admissible as the statement of a collective fact and
not a mere conclusion." 2 Words & Phrases, Second Series, 206; State
v. Mace, 118 N. C. 1244, 24 S. E. 798; State v. Saunders, 14 Or. 30, 12
Pac. 441; State v. Lee, 58 S. C. 335, 36 S. E. 706.

In the case at bar the evidence shows that immediately after
the homicide the deceased was taken to the emergency
hospital and died within three hours thereafter. The       5
statement he made to Sheriff Corless that McNair shot
him without cause was made after the doctor had treated him
for his wounds, and after Little had conversed with him,
and but a short time before he signed the written statement re-
ferred to. In the written statement the facts relating to the
shooting, as the deceased claimed them to be, are set forth in
detail, and they conclusively show, if true, that the shooting
was without cause or provocation. Therefore, whatever view
may be taken respecting the admissibility of the declaration
as an academic question, it was not prejudicial. The case of
State v. Carrington, 15 Utah, 480, 50 Pac. 526, is cited and

relied on by appellant to support his contention on this point. In that case the deceased in her dying declaration stated for what purpose the defendant performed a certain act. This court held that "no witness can state with what purpose another person performed an act," and reversed the judgment. It will be observed that that question is not involved in the case at bar, and hence the Carrington Case is not in point, and we are not called upon to either approve or disapprove the doctrine there announced.

The court, after instructing the jury fully and very clearly respecting the first degree murder, and on each of the degrees of homicide included therein, proceeded and charged the jury as follows:

"You are further instructed that the offense of murder in the second degree, voluntary manslaughter, and involuntary manslaughter are included in the offense charged in this information, and under our law a defendant may be convicted of either of such offenses so included; and *if in this case it shall appear to you that the defendant committed a public offense,* and there is in your minds a reasonable doubt of which, of two or more degrees he is guilty, you can convict him of the lowest of such degrees only."

The giving of that part of the instruction which we have italicized is assigned as error.

It is vigorously contended on behalf of the appellant that because of that part of the instruction which we have italicized the jury might well have believed that they were at liberty to find the defendant guilty of any offense. We do not think the instruction is susceptible of any such construction, especially when considered in connection with the balance of the charge of the court. Furthermore, the verdict of the jury, which is as follows, "We, the jury impaneled in the above case, find the defendant guilty of murder in the second degree as charged in the information," is a complete answer to and refutation of counsel's argument that the jury, when they found the defendant guilty, may have had in mind some offense not included in the charge for which he was on trial.

There are other alleged errors assigned, but we do not deem them of sufficient importance to warrant a further discussion of the case.

Judgment affirmed.

FRICK, C. J., and CORFMAN, THURMAN, and GIDEON, JJ., concur.