(No. 22085.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ARMIN L. KREUTZER, Plaintiff in Error.

*Opinion filed December 22, 1933.*

George W. Field, for plaintiff in error.

Otto Kerner, Attorney General, Charles E. Mason, State's Attorney, and J. J. Neiger, (Okel S. Fuqua, and John R. Bills, of counsel,) for the People.

Mr. Justice Jones delivered the opinion of the court:

The defendant, Armin L. Kreutzer, was in the circuit court of Lake county found guilty of manslaughter. The indictment against him contained nine counts, each charging him with the murder of Anna Balis by abortion. There were two jury trials. The first resulted in a verdict of murder, which was set aside upon a motion for a new trial. The second resulted in a verdict of manslaughter as heretofore stated.

The defendant lived in Milwaukee, Wisconsin. He was not a physician but maintained an office at Cudahy, near Milwaukee, where he treated women. He also maintained a maternity home in Lake county, Illinois, near the Wisconsin line. There was no licensed physician connected with his office or the maternity home. At the latter place he employed two women, neither of whom was a nurse. One of the rooms at the maternity home contained an operating or delivery table, a full set of obstetrical instruments, and equipment for vaginal examinations, dressings and irrigations. Anna Balis was a married woman and had given birth to several children. She went to the defendant's office on October 21, 1932, accompanied by a

man named Gapko, and told the defendant she was in trouble and had missed two periods, menstrual. She was in an apparently healthy condition and was not afflicted with any organic disturbance. She had been performing her usual household duties. Arrangements were made whereby she was to pay the defendant $150 for treatments to be administered to her. Of the total fee there was paid by Mrs. Balis $70 or $75. The defendant made a cursory examination and told her that he would have a doctor in the health department examine her. He called Dr. Felix J. Baur by telephone and said that a woman came to see him last night who claimed to be two months pregnant, but from her symptoms he had concluded that she had a fibroid or needed a cleaning of the uterus. He asked Dr. Baur to go to see her at her home. Pursuant to the defendant's request Dr. Bauer went to the home of Mrs. Balis, where he examined her. He found an enlargement in the lower part of the abdomen which was about the size of a grapefruit. He was at that time uncertain whether she had a tumor or was pregnant. The day following Dr. Baur's examination of Mrs. Balis she again went to the defendant's office. Dr. Baur reported to the defendant it was uncertain whether Mrs. Balis had a tumor or was pregnant and that he prescribed vaginal irrigations. The defendant testified he gave vaginal irrigations to Mrs. Balis daily from October 22 to November 5, with the exception of three days when he was sick in a hospital. On the last mentioned date, at the defendant's directions, Mrs. Balis went to the maternity home, where the defendant continued to treat her. On November 10 her temperature became high and the defendant took her in his automobile from the maternity home to a hospital in Milwaukee, where he let her out, telling her she would be met by a doctor. Dr. Baur testified he had been notified by the defendant of her coming to the hospital; that her temperature, when she arrived, was 105,

pulse 110 and respiration 30; that he examined her abdomen and found it fairly soft, with a tenderness in the right lower region; that the enlargement he had observed on his first examination was not present; that the uterus was sore, soft and inflamed and was emitting a foul-smelling discharge, and that he decided there had been a septic thrombus. She remained at the hospital until her death, December 16, 1932. Dr. Baur testified that the defendant asked him whether, in making out the death certificate, it could show death was due to the after-effects of a tumor operation. Dr. Baur answered in the negative.

Dr. Edward L. Miloslavich, a specialist in bacteriology and pathology, made a post-mortem examination of the body of Mrs. Balis at the request of the coroner of Milwaukee and testified to a number of pathological conditions which indicated Mrs. Balis was pregnant a short time before her death. He examined her sexual organs and found the uterus reddened and inflamed. When he had carefully removed the pus he discovered on the right posterior side of the uterus a groove in the mucous surface which measured a little more than a half inch in length. Close to the groove were three abscesses which originated from the groove. He also found parts of a placenta. There was an abscess on the posterior wall of the uterus. The right ovary showed anatomical signs of pregnancy together with afterbirth in the uterus. Streptococci were prevalent, and the witness stated the cause of death was generalized septicemia originating from the uterus, in the region of the groove. Over the defendant's objection the witness testified that the groove was caused by the insertion of an instrument, and, also over the defendant's objection, he gave a medical definition of the word "abortion."

The defendant admitted giving the vaginal treatments but denied that he inserted any instrument into the womb of Mrs. Balis and denied that he did anything to cause an abortion or miscarriage.

The prosecution introduced as a dying declaration a written statement signed by Mrs. Balis on December 7, 1932. The document is a recital of her version of occurrences, beginning with her first visit to the defendant on October 21, 1932, to and including November 10, 1932. It states, among other things, that on Wednesday, November 9, the defendant placed her on an operating table and proceeded to operate on her womb with instruments that caused her very severe pains; that she had no conception of the length of time consumed by the operation, but when it was concluded the defendant showed her what he had removed from her womb, and that it was a baby cut apart and in several pieces. The defendant objected to the admission of the statement as a dying declaration because it was under oath, had reference to matters both antecedent and subsequent to the commission of the crime charged, contained statements not connected with the death, and was not made under the belief that death was impending and so immediate that there would be no opportunity for repentance or avoidance. No reason is assigned why a dying declaration may not be sworn to, and we perceive none. The statement is a chronological recital of the events leading up to and including the alleged commission of the crime charged and of the entrance and detention of Mrs. Balis in the hospital. The incidents and occurrences set forth are directly connected with the crime, if any, and could have been testified to by Mrs. Balis in a prosecution for criminal abortion had she lived. (*Scott* v. *People*, 141 Ill. 195.) It is a general rule that declarations of the victim before the homicidal act was committed are admissible where they are so connected therewith as to form a part of the same transaction and illustrate and explain the killing. (30 Corpus Juris, 272; *Nordgren* v. *People*, 211 Ill. 425.) The only event mentioned in the statement which took place after the criminal act relates to her physical condition following the removal of the fœtus. That con-

dition, when shown, constituted a material and competent part of the proof of matters connected with the alleged abortion and death. The declaration does not contain any express statement that Mrs. Balis was then under a fixed belief that her death was certain to follow almost immediately or that she had abandoned all hope of recovery. All it contains as an indication of her belief on that subject is, "I hereby make what may be my last declaration in life." But the surrounding facts and circumstances leave nothing to doubt about her fixed conviction that death was inevitable and near as a direct result of her weakened physical condition, that she entertained no hope of recovery, and that the statement was made in consequence of that conviction. The record shows Dr. Baur felt at all times after November 10 that Mrs. Balis was in a very serious condition and that there was little chance of recovery. While the admissibility of the declaration depends in nowise upon what he thought of her state of health, nevertheless his testimony discloses her actual condition, and it is reasonably inferable that the patient was to some degree conscious of her physical frailty. The declaration was reduced to writing by Walter Drews, who testified that Mrs. Balis declared she realized she was likely to die soon and wanted to meet her Lord with a clear conscience. A nurse in attendance witnessed the making of the declaration, and testified that Mrs. Balis at that time said she was very sick and knew she was going to die. Blanche Luber, a friend of Mrs. Balis, visited her every day at the hospital and heard the declarant frequently say she would not recover, and that she wanted the witness to buy her a light-pink dress for burial and dress the children for the funeral. She asked as a favor that the witness take the children to her home and care for them. When declarant's brothers, Louis and Peter, attempted to cheer her, she remonstrated with them and told them she was going to die—that she had already made her death statement. She gave direc-

tions as to the style of coffin she wanted, the undertaker she desired to be employed, the church in which the funeral was to be conducted and the cemetery where her body was to be laid at rest. She was a Roman Catholic and sent for her parish priest, who saw her on November 28 and on December 2. On the last occasion he administered to her the religious consolations of the church, and she stated to him, "Father, I am going to die and it is a just punishment."

A dying declaration in a homicide case, if made under a fixed belief of impending death, when hope of recovery is entirely gone, is admissible even though the declarant be not actually at the point of death and though she may live for a considerable time thereafter. (*People* v. *Cassesse,* 251 Ill. 422; *People* v. *Corder,* 306 id. 264.) The conclusions expressed in the declaration are based upon antecedent statements of facts and constitute no valid objection to the admissibility of the document. (*Murphy* v. *People,* 37 Ill. 447; *People* v. *Buettner,* 233 id. 272; *People* v. *Selknes,* 309 id. 113.) A declaration by a patient that she had been operated on is a statement of substantive fact.

Janet Biegaj, a daughter of a midwife in Milwaukee, testified she had known the defendant since June, 1930, when he came to her house, introducing himself as Dr. Kreutzer. He gave her a number of his business cards and said he understood the witness' mother was a midwife and asked if she performed abortions. The witness answered in the negative, and the defendant stated that if the mother did not perform them why not send pregnant women to him? He offered to give the witness $10 for every pregnant woman she sent to him for an operation. She saw him again shortly thereafter and he asked why she did not send any pregnant women to him. The witness testified to a similar conversation in the latter part of October, 1932. Counsel for the defendant objected to

this testimony, and claims that it is not permissible to show a willingness to commit other distinct crimes not connected with the one charged in the indictment. This contention cannot be sustained under the decisions in *Clark* v. *People,* 224 Ill. 554, and *People* v. *Hagenow,* 236 id. 514. The testimony was not offered for the purpose of showing independent crimes but of showing criminal intent. His personal solicitation of unlawful employment, his distribution of business cards and his method of carrying on his trade proves beyond doubt that he was a professional abortionist, with criminal intent to produce miscarriages for profit.

No error was committed by the court in allowing Dr. Miloslavich to testify that the groove he found in the uterus was caused by the insertion of an instrument. Counsel for the defendant contends that the court's ruling is contrary to the holding in *People* v. *Rongetti,* 338 Ill. 56, and *People* v. *Huff,* 339 id. 328. In those cases we held that it was improper to ask the opinion of a witness as to whether an abortion had been actually performed, because that question is the ultimate one which the jury would be called upon to decide. Dr. Miloslavich was asked no such question. After he had described an injury to the uterus he was asked to give his opinion as to the cause. This was clearly within the field of expert testimony. It is a familiar rule that physicians may testify that a wound was caused by gunshot, by a blunt instrument or by a sharp instrument, or by the projection or insertion of a foreign body or instrument. *People* v. *Patrick,* 277 Ill. 210; *People* v. *Hagenow, supra; People* v. *Zwienczak,* 338 Ill. 237.

Nor was it erroneous for the court to permit a medical witness to define the word "abortion." During the course of the trial the word was used frequently and probably was generally understood, yet no harm could result from having it defined by a medical witness. It was more apt to contribute to an understanding verdict than otherwise.

A record free from substantial error discloses the defendant's guilt beyond all reasonable doubt. The trial was fairly conducted and a verdict consistent with the law and the facts was returned. The judgment of the circuit court is therefore affirmed.          *Judgment affirmed.*