STATE

v.

**Paul J. GAZERRO and Scott T. Badessa.**

**No. 77–338–C.A.**

Supreme Court of Rhode Island.

Sept. 17, 1980.

Dennis J. Roberts II, Atty. Gen., Joel D. Landry, Asst. Atty. Gen., for plaintiff.

John F. Cicilline, Providence, William M. Kunstler, New York City, for Paul J. Gazerro.

John A. O'Neill, Jr., Providence, for Scott T. Badessa.

## OPINION

BEVILACQUA, Chief Justice.

The defendants, Paul J. Gazerro and Scott T. Badessa, were indicted on March 19, 1976, for the murder of Robert M. Demirjian, in violation of G.L.1956 (1969 Reenactment) § 11-23-1, and for conspiracy to murder, in violation of G.L.1956 (1969 Reenactment) § 11-1-1. After a trial in the Superior Court, a jury acquitted both defendants of the conspiracy charge but found them both guilty of murder in the second degree. The defendants filed motions for a new trial, which were heard and denied. Badessa was sentenced to twenty years in the Adult Correctional Institutions (ACI), ten years to serve and the remaining ten years suspended with probation to begin upon release. Gazerro was sentenced to life imprisonment. After judgments of conviction were entered, both defendants filed timely appeals.

The state's case was based primarily on a tape-recorded conversation between Sergeant George A. Ellingwood of the Scituate police department and the victim, Robert Demirjian, on February 7, 1976, four days after the victim was shot and two days before he died. Demirjian's statements, made in response to Sgt. Ellingwood's questions, revealed that Demirjian, Scott Badessa, Paul Gazerro, and Robert Ruggieri[1]

---

1. Robert Ruggieri was indicted with the defendants on the same charges. His trial was sev-

ered, and in 1978 he pleaded guilty to the lesser included offense of misprision of a felony. He

were riding in Badessa's car and that Gazerro turned around from the front seat and shot Demirjian.

■ The state prepared to introduce the statements into evidence under the dying–declaration exception to the rule against hearsay. The trial justice conducted a pretrial evidentiary hearing, at the close of which he found that the legal predicates for the admissibility of a declarant's statements as a dying declaration, including the consciousness of impending death, had been satisfied.[2] The defendants assert that this ruling was erroneous.

On review, we must determine from the record whether the evidence supports the trial justice's findings. We therefore shall set out the factual circumstances that led up to the victim's statements. At about 6:50 p. m. on February 3, 1976, George Langford, a motorist driving north on Route 102 in Clayville, between the towns of Foster and Scituate, observed a man lying at the side of the road. He stopped his car and, believing that the man was probably injured, sent his son to seek assistance for the victim at a nearby house occupied by David Peloquin. Peloquin telephoned the Scituate rescue squad immediately. When the ambulance arrived, Raymond Blackmore of the Scituate Ambulance Corps examined the man and found him "semi- -conscious" and bleeding, with wounds in his chest and surface lacerations on his face and head. The ambulance attendants were able to learn nothing about the incident immediately; only after the rescue squad had rushed the man to Rhode Island Hospital did they learn that his name was Robert Demirjian.

Sometime between 7:30 and 8:15 p. m., Sgt. Ellingwood spoke to the victim in the hospital emergency room in an attempt to obtain factual information about the shooting. Ellingwood testified that at the time Demirjian was in great pain but conscious and that he did not respond to Ellingwood's request for the names of the assailants. During the night, the victim underwent twelve hours of major surgery, during which doctors removed four bullets from his chest and abdomen. The following morning, he was taken to the Intensive Care Unit (ICU) for continuing treatment.

On Wednesday afternoon, February 4, the victim's brother, Gregory Demirjian, visited the ICU. Because the doctors had inserted a ventilator tube into Demirjian's throat, he was unable to answer Gregory's questions orally. In responding, therefore, the victim either shook his head to indicate no or nodded his head and squeezed Gregory's hand to indicate yes. The victim's demeanor and responses convinced Gregory that his brother was going to survive and that he intended to handle the matter himself.[3]

was sentenced to serve eight months in the Adult Correctional Institutions (ACI).

2. In addition to the declarant's sense of impending death, to admit statements as a dying declaration the court must find that (1) death ensued, (2) the statements are sought to be admitted in a criminal prosecution against the person(s) who allegedly killed the declarant, and (3) the statements must relate to the circumstances of the homicide. *McCormick's Handbook of the Law of Evidence* §§ 282 283 at 680 83 (2d ed. Cleary 1972).

3. At trial, Gregory recalled the conversation:
"Q  Did you ask him any other questions at this time, that you can remember?
"A  As I said, I asked him once, 'Are you going to live?' And he nodded his head confidently, 'yes,' and I was not sure, and so I asked him the same question again, 'Are you sure you are going to live?'

"Q  Did he respond to that?
"A  He looked at me * * *. Shook his head 'yes.'
"Q  What else did you ask your brother on this day?
"A  I asked him if he knew who did it to him * * *.
"Q  Did he give you any indication in response to that question?
"A  Yes, he did.
"Q  What did he do?
"A  He shook his head 'yes.'
"Q  Did you ask him any other questions on this day?
"A  Yes, I asked him if he was going to take care of the matter in his own way, take care of it by himself.
"Q  Did he give you any response to that question?
"A  Yes, he did.
"Q  What did he do?

Doctor John Pellegrini, a resident who treated Demirjian, testified that on Thursday, February 5, the patient was on the critical list, indicating that at all times he was in imminent danger of dying until his condition improved sufficiently to permit his name to be removed from the list.[4] Sergeant Ellingwood was nevertheless permitted to visit Demirjian again at 11:40 a. m., and he continued his inquiry. Sergeant Ellingwood succeeded in learning that Demirjian had been in an automobile with three people when he was shot; that he had been sitting in the back seat and that someone in the front seat had turned around and shot him; that he had then been thrown from the car down an embankment off the highway; that he did not know who had shot him, but that whoever it was had not been one of his friends; and that the incident had had nothing to do with a quarrel in which he had been involved a few weeks earlier. Sergeant Ellingwood also asked Demirjian whether Paul Gazerro or Scott Badessa had dropped him off in Cranston in the afternoon before the shooting; he answered "no." When Sgt. Ellingwood returned at 3:05 p. m. to continue his inquiry, he asked whether Ruggieri, Badessa, or Gazerro had been in the car when the shooting occurred; Sgt. Ellingwood got no answer. He then asked if Richard Cipriano had been involved; the victim shrugged his shoulders. Sergeant Ellingwood returned twice on February 6, once in the morning and once in the afternoon. He showed De-

mirjian mug shots of various people and asked again about Badessa and Gazerro. Again, Demirjian did not answer.

At about 9 a. m. on February 7, finding that Demirjian had managed to remove the ventilator and was breathing better, Dr. Pellegrini administered one dose of Narcan, a narcotic antagonist, and another dose at about 11 a. m.[5] Doctor Pellegrini testified that Demirjian, whose mental state had been fairly clear throughout the treatment, became more alert and lucid after the first dose of Narcan. At sometime before 11 a. m. the patient attempted to get out of bed and leave the ICU because, he claimed, he had business to take care of. Doctor Pellegrini stopped him and told him that, cut off from the life–support systems, he would not live for more than fifteen minutes. Afterwards, according to Pellegrini, Demirjian quieted down.

At 12:05 p. m., Sgt. Ellingwood arrived and spoke to Dr. Pellegrini about Demirjian's condition. The doctor conceded to the police officer that at that time Demirjian's condition remained critical and his chances for survival were poor. Sergeant Ellingwood testified that he then went into the patient's room and, in the presence of another officer and a nurse, told Demirjian he was going to die and that if he died, no one would ever know who had shot him. Demirjian then told Sgt. Ellingwood that it was Paul Gazerro who had shot him. Sergeant Ellingwood immediately directed the officer to bring in the tape recorder. The officers then taped the conversation in

"A   With confidence he shook his head 'yes,' meaning he was going to take care of it when he was better."
This conversation did not form part of the dying declaration. The state introduced it as evidence to show Demirjian's self–reliance and unwillingness to cooperate with the police. *See* 6 Wigmore, *Evidence* § 1790 at 320 (Chadbourn rev. 1976).

4.   Doctor Pellegrini testified that Demirjian was being administered a variety of medications– antibiotics, sedatives, and painkillers. He also *described* various life–support systems performing vital functions: a ventilator administered oxygen and other gases through a tra-

cheal tube; a hemo ·dialysis shunt cleaned and retransferred his blood because of kidney failure; a catheter in his bladder removed urine, several intravenous tubes delivered fluids and medication and other tubes in his chest and abdomen drained accumulated fluids.

5.   The doctors had been injecting Demirjian with a sedative, morphine sulphate. Because the patient's ventilation had improved somewhat, Pellegrini administered the Narcan to counteract the "shallow breathing," which is a physiological manifestation of the respiratory depressant action of morphine.

which Demirjian accused Gazerro of the shooting and named Badessa and Robert Ruggieri as the other two occupants of the vehicle.[6]

6. "Q Sgt. Ellingwood: Who shot you, Dirk?
"A Mr Demirjian: Gazerro.
Sgt Ellingwood: Gazerro? What's his first name?
Mr. Demirjian: Paul.
Sgt. Ellingwood: I can't hear you, Dirk.
Mr. Demirjian: Paul Gazerro.
Sgt. Ellingwood: Why did he shoot you, Dirk?
Mr. Demirjian: I swear I don't know. That I swear I don't know. I swear. I swear.
Sgt. Ellingwood: Okay, Dirk, take it easy. Whose car was you in, Dirk?
Mr. Demirjian: I was in I was in Badessa's car, I swear I was in Badessa's.
Sgt. Ellingwood: You was in Badessa's car?
Mr. Demirjian: I swear, yeah.
Sgt. Ellingwood: Was Badessa driving?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: Who else was in the car?
Mr. Demirjian: Ruggieri.
Sgt. Ellingwood: Ruggieri?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: What's his first name?
Mr. Demirjian: Robert.
Sgt. Ellingwood: Robert?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: He's your friend, isn't he?
Mr. Demirjian: I thought he was, I swear.
Sgt. Ellingwood: You don't know why (blank)
Mr. Demirjian: No, I swear. I didn't do nothing, I swear. I swear I didn't do it.
Sgt. Ellingwood: Where was you, (blank) in the back seat?
Mr. Demirjian: Yeah, I was.
Sgt. Ellingwood: You was?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: And who turned around and shot you?
Mr. Demirjian: I swear Gazerro did.
Sgt. Ellingwood: You swear Gazerro did?
Mr. Demirjian: I swear.
Sgt. Ellingwood: Do you know where you was? Was you in Cranston?
Mr. Demirjian: Scituate.
Sgt. Ellingwood: You was in Scituate?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: What was you doing in Scituate?
Mr. Demirjian: I swear I don't know. I swear. I swear on the top of my
Sgt. Ellingwood: Okay, Dirk. * * * Your name is Robert Demirjian?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: Do you know why you were in Scituate?
Mr. Demirjian: I swear I don't know. I swear on Christ's soul.
Sgt. Ellingwood: Where was taking you, Dirk?
Mr. Demirjian: I have no idea. I swear I don't know.
Sgt. Ellingwood: Do you think Cipriano is behind this?

Mr. Demirjian: I swear I don't know that. I swear I don't know that.
Sgt. Ellingwood: Okay, Dirk.
Mr. Demirjian: I swear.
Sgt. Ellingwood: But you're sure that Paul Gazerro shot you.
Mr. Demirjian: Yes, I am.
Sgt. Ellingwood: Okay, Dirk, thank you.
Sergeant Ellingwood then left the room but was immediately called back by Nurse Toher because Demirjian had more to say:
Sgt. Ellingwood: You just told my why you thought    shot you. You asked Gazerro, right? Gazerro told you?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: What did he tell you, Dirk?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: Did Paul Gazerro tell you why you were shot? Dirk? Can you hear me?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: Why was you shot?
Mr. Demirjian: Because he was in California.
Sgt. Ellingwood: Right.
Mr. Demirjian: He's in California.
Sgt. Ellingwood: Okay, Did Gazerro tell you that somebody ordered you to be shot?
Mr. Demirjian: (No response)
Sgt. Ellingwood: Did you ask Gazerro why?
Mr. Demirjian: (No response)
Sgt. Ellingwood: Dirk?
Mr. Demirjian: Because I knew Cippy was in California.
Sgt. Ellingwood: Because you knew he was in California.
Mr. Demirjian: Yeah.
Sgt. Ellingwood: Did Cippy have it ordered that you get shot?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: I can't hear you.
Mr. Demirjian: Yeah.
Sgt. Ellingwood: So Cipriano ordered you to be shot, is that right, Dirk?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: Okay, thank you. (Pause)
Mr. Demirjian: Was in California, I have not talked with said anything last time I knew he was anywhere was two was two was two weeks.
Sgt. Ellingwood: Two weeks ago he was in California, that was the last time you saw him? Dirk, where was he in California?
Mr. Demirjian: L.A.
Sgt. Ellingwood: L.A.?
Mr. Demirjian: Yeah.
Sgt. Ellingwood: Where in L.A.?
Mr. Demirjian: That's all I never talked to him about all I know is he's somewhere in L.A.
Sgt. Ellingwood: Somewhere around L.A.?
Mr. Demirjian: That's all I know. That's all, I swear.
Sgt. Ellingwood: Gazerro told you he shot you because Cipriano ordered it?

Registered Nurse Debra Toher testified that several times on February 7 Demirjian had asked her if he was going to die and that she had responded that she did not know. Later in the afternoon, Demirjian again became "rambunctious" and attempted to disengage himself from the life–support systems so that he could leave the hospital. Late that evening, however, the patient's deteriorating condition prompted the doctors to reinsert the ventilation tube. His condition never improved; at about 8:30 p. m. on February 9, he died.

The belief in a particular likelihood of truthfulness surrounding deathbed statements was widely held before the recognition of the rule against hearsay in the 1700s. Therefore, as soon as a general rule prohibiting the admission of hearsay evidence in the early eighteenth century was recognized, the courts also carved out an exception for dying declarations. *McCormick's Handbook of the Law of Evidence* § 281 at 680 (2d ed. Cleary 1972). The basis for the exception was that the unavailability of the declarant created a need for the evidence and that consciousness of the approach of death strongly disposed the declarant to tell the truth, thus guaranteeing the reliability of the declaration. *Id.* § 282 at 680.

In *State v. Sullivan and Dalton*, 20 R.I. 114, 37 A. 673 (1897) this court stated: "[i]n order to render the statements of the deceased admissible as a *dying declaration*, it was only necessary to show to the satisfaction of the *court*, in the first instance, that it was made under sense of impending death; * * * the rule as to the admissibility of a dying declaration being that it is enough if it satisfactorily appears, in any mode, that it was made under the sanction of impending death, whether this be directly proved by the express language of the declarant, or be inferred from his evident danger, or the

Mr. Demirjian: (No response)
Sgt. Ellingwood: I can't hear you, Dirk.
Mr. Demirjian: Yeah."

**7.** Although defendants suggest that admission of a dying declaration implicates the Sixth Amendment right to confront adverse witness-

opinions of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to to ascertain the state of the declarant's mind." *Id.* at 118, 37 A. at 675. (Emphasis in original).

The question of the admissibility of a dying declaration, therefore, turns primarily on the state of the declarant's mind at the time he makes the statements. This determination calls upon the trial court to make what Mr. Justice Frankfurter called in another context, an "imaginative recreation, largely inferential, of internal, 'psychological' fact." *Culombe v. Connecticut*, 367 U.S. 568, 603, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1058 (1961) (voluntariness of confession). The most probative evidence on the issue would most likely be an express statement by the decedent that he knew he was going to die. *See Bishop v. State*, 92 Nev. 510, 518, 554 P.2d 266, 271 (1976); *State v. Jeswell*, 22 R.I. 136, 139, 46 A. 405, 406–07 (1900) (written statement). Although Sgt. Ellingwood testified at trial that Demirjian had nodded in agreement when Ellingwood told him he was going to die, the trial justice nevertheless found no "express language" in this case. In the absence of express language, we are left to examine the surrounding circumstances, and to recreate by inference the declarant's mental state. *State v. Sullivan and Dalton*, 20 R.I. at 118, 37 A. at 675.

Upon our examination of the record we are persuaded that the evidence supports the conclusion that Demirjian made the statements with the requisite consciousness of impending death and that they were therefore admissible as a dying declaration.[7] In reaching this conclusion, we give substantial weight and deference to the trial justice's findings of fact. *See* 5 Wigmore, *Evidence* § 1442 at 298–301 (Chadbourn rev. 1974) (poor policy to disturb ruling of trial

es, courts have rejected this argument. *See Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Bell v. Arn*, 536 F.2d 123 (6th Cir. 1976); *Chandler v. Maryland*, 360 F.Supp. 305, 310 (D.Md.1972).

justice upon meaning of factual circumstances).

There can be little doubt that life–threatening wounds had been inflicted on Demirjian by his assailant. He had five bullet wounds in his chest and abdomen. Doctor Pellegrini described in graphic detail the extensive life support systems, the ventilation tube, the intravenous tubes and the kidney dialysis mechanism. There can therefore be little doubt that Demirjian was fully conscious of the wounds and of their grave character. *State v. Sullivan and Dalton, supra; see Butts v. State,* 126 Ga.App. 512, 514, 191 S.E.2d 329, 332 (1972); *People v. Franklin,* 70 Mich.App. 343, 345, 245 N.W.2d 746, 747 (1976); *Bishop v. State,* 92 Nev. 510, 519, 554 P.2d 266, 272 (1976).

■ A dying declarant's state of mind may also be inferred from the statements concerning his condition made to him by others. *State v. Sullivan and Dalton,* 20 R.I. at 118, 37 A. at 675. By February 7 Dr. Pellegrini believed that Demirjian had little or no chance for survival, and he had repeatedly given Sgt. Ellingwood that assessment. Doctor Pellegrini's policy was not to inform patients of their prospects for survival; however, when Demirjian tried to disengage himself on February 7, Dr. Pellegrini told him he was seriously ill and sternly warned his patient that he would not survive fifteen minutes if he left. We may infer that this statement, along with Ellingwood's more direct statement, had a substantial impact on Demirjian's state of mind. *See State v. Jordan,* 216 N.C. 356, 362, 5 S.E.2d 156, 159 (1939); in effect, they caused him to cooperate fully with the police officers. Furthermore, although the record does not reveal the timing, Demirjian apparently asked Nurse Toher several times if he was going to die. Nurse Toher's ambivalent, evasive, "We don't know" repeated more than once, could hardly have been reassuring to a patient seeking a direct assessment of his prospects for survival.

■ The third circumstantial factor from which the declarant's belief in impending death may be inferred is his conduct prior to the statement. *State v. Sullivan and Dalton,* 20 R.I. at 118, 37 A. at 675. In Demirjian's case, this factor is somewhat problematical. The defendants argue that both the victim's attempt to get out of bed and leave on the morning before the declaration and the February 4 conversation in which he convinced his brother that he would pull through and avenge the attack tend to rebut the claim that he believed that his death was approaching. The state argues that Demirjian had usually been uncooperative with law enforcement officials and had always taken care of his own problems. His earlier words and deeds reflected that character trait; however, his willingness to cooperate on February 7 marked a significant change in the mental attitude manifested by those earlier words and deeds. The inference is strong that at that time both the refusal to cooperate and the stubborn will to retaliate had disintegrated in face of the statements of Dr. Pellegrini and Sgt. Ellingwood. We may reasonably infer that any illusions of recovery had been shattered, a fact which may reasonably explain Demirjian's unexpected willingness to cooperate fully.[8] That he would not survive became evident to him, and he may have realized that he must name his assailants if ever they were to be punished. The circumstances strongly support the inference that Demirjian knew he would die; moreover, they give us no cause to suspect that Demirjian harbored any motive to fabricate an untruth.[9] We find no error in the

8. The trial justice found the victim's willingness to cooperate, after several refusals to identify his assailants, to be equivalent to specific language expressing an awareness of the approach of death.

9. One other circumstance merits brief mention. Between 2 and 3 p. m. on February 5, a priest entered Demirjian's room in the ICU and asked a police guard to point out the victim. Demirjian was conscious and looked at the priest while they spoke briefly. The priest then said a prayer, made the sign of the cross, and departed. We attach minimal significance to the visit. It may have incrementally increased Demirjian's fears that his condition was grave. The visit apparently was not solicited by the patient, however, and it therefore does not constitute

trial justice's ruling that the taped conversation and the statements made immediately beforehand were admissible as a dying declaration.

## II

Both defendants argue that the trial justice erred by not instructing the jury that a necessary predicate of a dying declaration is the declarant's consciousness of impending death.[10] Badessa argues that the jurors should be so instructed in order to permit them to make an independent determination on the admissibility of the dying declaration. He relies on the Massachusetts rule stated in *Commonwealth v. Brewer*, 164 Mass. 577, 42 N.E. 92 (1895). *Accord, State v. Chaplin*, 286 A.2d 325 (Me.1972). Gazerro, while agreeing with Badessa, seems more concerned that without instructions informing them that a dying declaration must be made under a sense of impending death, the jurors lack the guidance necessary to determine the declarant's " 'disposition truly to tell what he remembers.' " *State v. Sullivan and Dalton*, 20 R.I. at 119, 37 A. at 675.

The admissibility of evidence is to be determined by the trial court. Accordingly, once the trial justice finds from the evidence that there is a sufficient foundation to admit the dying declaration, the declaration is presented to the jury to be considered and weighed along with the credibility of the declarant. To permit the

issue of admissibility to be redetermined by the jury is an error of policy because it encumbers the jurors with legal definitions with which they are unfamiliar. *See* 9 Wigmore *Evidence* § 2550 at 503 (3d ed. 1940).

Upon examination of the charge we find that the jury was properly instructed with regard to the law. The record shows that the jurors were properly instructed on the issue of the credibility of the witnesses and with regard to the probabilities of the truthfulness of Demirjian's declarations. The evidence considered by the trial justice at the pretrial hearing involving the circumstances surrounding the dying declaration was also presented to the jury. We are not persuaded by defendant's argument that because the jurors were not instructed that Demirjian must have been under the belief of impending death, they were unable properly to evaluate his disposition to tell the truth. *See State v. Sullivan and Dalton*, 20 R.I. at 118, 37 A. at 675.

## III

The defendants attempted to introduce evidence to show that another individual other than defendants had a motive to murder Demirjian. The trial justice refused to admit this evidence on the ground that it would not have been introduced with any evidence directly or circumstantially linking that individual with the crime. By offer of proof defendants showed that they would have introduced testimony that on January

the sort of request for a priest which may manifest both the declarant's desire to settle final accounts and the belief that he shall soon meet his Maker. *See, e. g., People v. Mattison*, 4 Cal.3d 177, 481 P.2d 193, 93 Cal.Rptr. 185 (1971); *People v. Kreutzer*, 354 Ill. 430, 188 N.E. 422 (1933); *Schlesak v. State*, 232 Wis. 510, 287 N.W. 703 (1939).

**10.** The trial justice instructed the jury:
"In this case, ladies and gentlemen, there is evidence of a dying declaration, that is the declaration of Robert Demirjian. The credibility of the declarant * * * and the weight that you will give to the declaration is entirely up to you the jury. You may weigh all of the circumstances under which the declaration was made and then give it such credit as you believe that it deserves.

"In considering how much weight you will give to Mr. Demirjian's declaration you will consider, one, the trustworthiness of the reporter, that is Sergeant Ellingwood, as to his testimony as to what the victim told him after he told the victim that he was dying; and the trustworthiness of the recording as to the remainder; two, the capacity of the declarant, that is Mr. Demirjian, to remember accurately the facts that he recited in the declaration; and, three, Mr. Demirjian's disposition at the time to tell truly what he remembered. On this basis you may give full weight to the Demirjian declaration or you may give it some weight or you may give it no weight at all. How much weight you assign is for you, the jury, to decide."

Demirjian had intervened in the beating of Robert Ruggieri by a man named Edward Lato and his friends. As a result of his efforts, Demirjian had also been badly beaten and had received severe head wounds. Peter Gazerro, defendant's father, would have testified that about two weeks before the February 3 shooting, Demirjian had admitted to him to being in great fear that Lato would take further action against him. Gregory Demirjian would have testified that his brother had also confided to him his fears that Lato would come after him. The defendants contend that the effect of this evidence would have been to show a motive on the part of Lato to kill Demirjian.

■ Evidence of motive is often probative and relevant, and therefore admissible in proper circumstances. *See Commonwealth v. Boyle*, 470 Pa. 343, 359–60, 368 A.2d 661, 669 (1977). It is well settled, however, that such evidence must not lead the jury to speculate and must not improperly open up collateral matters. To be admissible, evidence of another person's motive to commit the crime with which a defendant is charged must be introduced in conjunction with other evidence tending to show the third person's opportunity to commit the crime and a proximate connection between that person and the actual commission of the crime. *See People v. Green*, 27 Cal.3d 1, 23, 609 P.2d 468, 480, 164 Cal.Rptr. 1, 13 (1980).

■ In this case, the offer of proof shows that defendants would have introduced absolutely no evidence placing Lato on February 3 in the vicinity of the spot where Demirjian was found. There was no evidence that Demirjian and Lato had had any further contact after the first beating. Admission of evidence of a beating that occurred nearly three weeks before and of Demirjian's alleged fears of another individual would have been an impermissible invitation to the jury to speculate on a collateral matter.

## IV

The defendants objected to the portion of the charge defining reasonable doubt essentially on two grounds: (1) the use of the phrase "actual substantial doubt" in effect raised the level of doubt that must exist in a juror's mind before he votes to acquit and (2) the charge was inadequate, confusing, and ambiguous.

■ The challenged portion of the charge set out the definition of reasonable doubt as follows.

"Beyond a reasonable doubt does not mean that the State is obliged to prove all of the essential elements of these crimes beyond all possible doubt; it doesn't mean that the State must prove the essential elements beyond a shadow of a doubt, some things are absolutely incapable of proof beyond all possible doubt, so the law says the State must prove the essential elements of these crimes beyond a reasonable doubt; that is a doubt based on reason. If you have an actual substantial doubt as to an essential element, that would be a reasonable doubt; but if this doubt is based on imagination or suspicion or apprehension, that is not a reasonable doubt."

We do not believe that the effect of the charge was to alter the legal standard of proof. In *State v. Mantia*, 101 R.I. 367, 223 A.2d 843 (1966), we had occasion to examine an instruction very similar to the one now before us. In that case, we stated that we would not consider by itself a sentence that had been taken out of context but would examine the charge as a whole. *Id.* at 376, 223 A.2d at 848. In words that are as dispositive of the instant challenge as they were of the challenge before us then, we stated, "It is apparent that in the portion of the charge wherein the word 'substantial' is used, the trial justice was telling the jury that any doubt which would absolve the defendant from guilt must have some foundation to it and not be fanciful or imaginary." *Id.* at 376, 223 A.2d at 848; *see State v. Murphy*, 113 R.I. 565, 573–74, 323 A.2d 561, 565 (1974).

The defendants also contend that this charge was inadequate and had the effect of confusing the jury. To bolster their contention, defendants refer us to a note sent by the jury foreman to the trial justice after several hours of deliberation: "If a number of jurors cannot accept the veracity of the 'dying declaration' without further corroborative evidence, is this justification itself for 'reasonable doubt?' * *." It seems to us that this question intimates, not the jurors' confusion surrounding the meaning of the legal concept "reasonable doubt," but rather a sincere desire properly to execute their obligation to apply the law to the facts and to reach a just verdict. Upon our examination of the record, we believe that any difficulties confronted by the jury were not created by an inadequate or ambiguous instruction concerning the law but by the troublesome character of the case.

## V

Gazerro's last contention is that the trial justice erred in denying his motion for a new trial on the basis of newly discovered evidence. On June 9, 1977, defendant Gazerro made a motion for a new trial based on the contention that the state had failed to produce exculpatory evidence in response to a general request during discovery. The evidence included the medical examiner's investigation report on the death of Robert Demirjian, which indicated that the time of the onset of injury was approximately 6:30 p. m. on February 3, and testimony of Irene Cipriano, in whose house the victim had been living, that before the homicide she had seen Demirjian at about 6 p. m. This evidence taken together with other defense testimony placing Gazerro at the City Hall Tap in Cranston at 6:30 to 6:45 p. m. could have been used to rebut the charge that he was involved in the shooting. The defendant argues that it would have been impossible for him to have picked up the victim at 6 p. m. in Cranston, to have taken him to Scituate, to have shot and dumped him at about 6:30 p. m., and then to be seen back in Cranston at the City Hall Tap between 6:30 to 6:45 p. m.

At the hearing on the motion on July 1, 1977, the trial justice admitted the medical examiner's report and heard the testimony of Irene Cipriano, and of Trudy Saccoccia, a neighbor whose testimony corroborated Mrs. Cipriano's. The defendant also sought to introduce the testimony of Burton Fain, the foreperson of the jury at the trial, to the effect that the new evidence would have induced him to change his vote. The trial justice, however, sustained the state's objection to the admission of this testimony. The trial justice ruled that the evidence contained in the medical examiner's report was not exculpatory. He also found that the Cipriano testimony had not been in the prosecution's possession and therefore did not fall within the guidelines of *In re Ouimette*, 115 R.I. 169, 342 A.2d 250 (1975), in which this court laid out standards by which to evaluate whether the prosecution's suppression or nondisclosure of material evidence warrants reversal of a conviction.

The state stipulated that it had had the examiner's report but had failed to turn it over upon request. Ouimette requires a trial justice to determine whether a request has been made, to determine what were the reasons or motivations for the suppression or nondisclosure, and then to evaluate the materiality of the evidence in light of his findings. *In re Ouimette*, 115 R.I. at 177, 342 A.2d at 254. The record before us does not indicate whether the prosecutor deliberately suppressed or merely neglected to produce, the onset–of–injury information. We believe, however, that in either event, the reference to the time of injury was not material to defendant's case. The report states that both the onset of injury and the transportation of the victim to the hospital occurred at approximately 6:30 p. m. Not only was the evidence hearsay from the Scituate police records but it also does not establish the actual time of the shooting to any greater degree than other evidence. In the absence of eyewitnesses, the actual time was left to speculation and inference. The report was minimally probative and certainly not "materi-

al" in the sense that it warrants reversal of the conviction and a new trial. *See In re Ouimette, supra.*

■ The trial justice rejected defendant's contention that the Scituate police had asked Mrs. Cipriano when she had last seen Demirjian and that the state had had that information in its files before trial. He therefore ruled that the *Ouimette* standards of materiality did not apply. He did not, however, evaluate the evidence in light of *State v. Carsetti,* 111 R.I. 642, 306 A.2d 166 (1973), which mandates a new trial when newly discovered evidence "would probably change the verdict * * *." *Id.* at 651, 306 A.2d at 171.

Mrs. Cipriano testified at the hearing that she had last seen Demirjian at "around six o'clock" when someone in a car stopped by her house to pick him up. She placed his departure at that time because the members of the household ate dinner between 5 and 5:30 p. m. and Demirjian had eaten with them that evening. She also testified that the police had visited her home the next evening and that she was "almost sure" they had asked her at what time Demirjian had left the house. Trudy Saccoccia, a neighbor who was present during the police visit, testified that one of the police officers had asked Mrs. Cipriano about Demirjian's time of departure and that Mrs. Cipriano had replied, "around supper time."

This testimony fails to establish facts and circumstances which would probably change the verdict. *State v. Carsetti,* 111 R.I. at 651, 306 A.2d at 171. The responses, "around six o'clock" and "around supper time," are vague enough to be interpreted consistently with the prosecution's case and do not rise to the requisite level of materiality to warrant a new trial.

## VI

At the close of the state's case, defendant Badessa moved for a judgment of acquittal pursuant to Super.R.Crim.P. 29, contending that the evidence was insufficient to warrant his conviction. The trial justice denied the motion. After the jury had returned its verdict acquitting him of conspiracy but finding him guilty of murder in the second degree, Badessa made a motion for a new trial, renewing his challenge to the legal sufficiency of the evidence. This motion the trial justice also denied. In view of our conclusion that the judgment of acquittal should have been granted, we do not review the denial of the new-trial motion.

■ In considering a motion for a judgment of acquittal, both the trial court and this court on appeal shall review the evidence in the light most favorable to the state, shall draw therefrom all reasonable inferences consistent with the defendant's guilt, but shall neither assess the credibility of witnesses nor assign weight to the evidence. *State v. Johnson,* 116 R.I. 449, 454, 358 A.2d 370, 373 (1976); *accord, State v. Gianoulos,* R.I., 404 A.2d 82 (1979). Unless the evidence so viewed establishes the defendant's guilt beyond a reasonable doubt, the motion must be granted.

Viewed most favorably to the state, the evidence shows that Badessa owned an automobile on February 3; that Badessa, Gazerro, Ruggieri, and Demirjian were seen together in Badessa's car in Cranston about two and a half hours before the shooting; that on February 7, Demirjian told Sgt. Ellingwood that he had been in Badessa's car when Gazerro shot him and that Badessa had been driving; that a man named Cipriano had ordered him shot; and that Demirjian was found in a rural area near Scituate. Examination of Scott Badessa's car revealed no physical evidence tending to indicate that a shooting had occurred in it.

Badessa was indicted as a principal in the commission of the homicide. Because the evidence indicates that defendant Gazerro actually pulled the trigger, Badessa's conviction is premised on his role as an "aider and abettor," as defined by G.L.1956 (1969 Reenactment) § 11-1-3, which states that "[e]very person who shall aid, assist, abet, counsel, hire, command, or procure another to commit any crime or offense, shall be proceeded against as principal or as an accessory before the fact, according to the

nature of the offense committed, and upon conviction shall suffer the like punishment as the principal offender is subject to by this title."

The question for determination is whether the evidence and the reasonable and legitimate inferences sufficiently support a finding that beyond a reasonable doubt Badessa aided and abetted in the shooting of Robert Demirjian. The evidence clearly shows that Badessa was present, as the driver, at the commission of the crime. We have recognized the well-established principle, however, that "mere presence at the scene, in and of itself, is insufficient to warrant a conviction." But it is a factor that must form part of a court's determination of the guilt of the defendant. *State v. Gianoulos*, 404 A.2d at 82; *see Hicks v. United States*, 150 U.S. 442, 449–51, 14 S.Ct. 144, 146–47, 37 L.Ed. 1137, 1140–41 (1893); *Bailey v. United States*, 416 F.2d 1110, 1113 (D.C.Cir.1969). Beyond mere presence, the circumstances must establish that a defendant "shared in the criminal intent of the principal and there must be a community of unlawful purpose at the time the act is committed. As the term 'aiding and abetting' implies, it assumes some participation in the criminal act in furtherance of the common design, either before or at the time the criminal act is committed. It implies some conduct of an affirmative nature and mere negative acquiescence is not sufficient." *Johnson v. United States*, 195 F.2d 673, 675 (8th Cir. 1952); *see Hicks v. United States*, 150 U.S. at 449, 14 S.Ct. at 146; 37 L.Ed. at 1140; *State v. Hicks*, 169 Conn. 581, 363 A.2d 1081 (1975); *Pace v. State*, 248 Ind. 146, 148, 224 N.E.2d 312, 313 (1967).

The primary question that courts have had to confront is what facts and circumstances, including a defendant's actual or constructive presence, will com-

bine to establish beyond a reasonable doubt a defendant's "guilty participation," *Bailey v. United States*, 416 F.2d at 1113, or "culpable purpose," *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir. 1971). *See generally,* Lafave & Scott, *Criminal Law* §§ 63–64 (1972). Factors not alone dispositive, but which will be considered in their totality, include association or relationship between the perpetrator and those accused of aiding and abetting, *see Ramirez v. United States,* 363 F.2d 33, 34 (9th Cir. 1966); *Moore v. Commonwealth,* 282 S.W.2d 613, 614 (Ky. 1955), and knowledge that a crime was to be committed. *Ramirez v. United States,* 363 F.2d at 35. Flight from the scene is also a factor to be considered.[11] *Hicks v. United States* 150 U.S. at 447, 14 S.Ct. at 146, 37 L.Ed. at 1140. Ultimately, what combination of evidence and inferences will be legally sufficient to support a verdict of guilty as an aider and abettor must be determined on a case–by–case basis.

We have carefully examined our previous cases in which the question, as here, concerned the legal sufficiency of the evidence tending to show a defendant's participation as an aider and abettor. In *State v. Colvin,* 82 R.I. 212, 107 A.2d 324 (1954), the defendant was charged in the breaking and entering of a dwelling house in the nighttime with intent to commit larceny. Police officers testified that the defendant had admitted planning the break–in with another and that she had driven him to the house and handed him a crowbar before he left the car. She waited in the car while the house was being burglarized, then drove the principals away and placed the booty in her dresser. Charged with breaking and entering a cleaning establishment, the defendant in *State v. Hart,* 106 R.I. 213, 258 A.2d 70 (1969) was observed waiting outside the building in an automobile with the engine running and the lights out. In that case, a

---

11. In *Bailey v. United States,* 416 F.2d 1110, 1115 (D.C.Cir.1969), the Court stated that "guilt, as a factual deduction, must be predicated upon a firmer foundation than the combination of unelucidated presence and unelucidated flight." In finding that flight alone was insufficient to support a conviction for aiding and

abetting, the Court rejected the notion that "the wicked flee when no man pursueth, but the righteous are as bold as a lion." *Id.* at 1114–15 (quoting *Alberty v. United States,* 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051, 1056 (1896)).

police officer testified that from a close distance he had observed two girls approach the car with parcels and that when they saw him, they had yelled, "cops!" and had fled on foot, and the defendant had sped away in the car. And in *State v. Raniello*, 113 R.I. 71, 317 A.2d 440 (1974), an indictment for robbery, one of the codefendants testified for the state that he, another man, and the appellant had met and planned the robbery before hand. He testified that during the robbery the appellant had waited in a car a few blocks from the scene.

In each of these cases we found the evidence sufficient to support the conclusion that the appellant had been present at the scene and had participated affirmatively, either by word or by deed, in the actual commission of the crime. In both *Colvin* and *Raniello*, the jury heard direct testimony to the effect that the defendant had had prior knowledge of and was instrumental in planning the crime. In *Hart*, the police officer, having observed suspicious circumstances, positioned himself close enough to the activity so that, as an eyewitness, he was able to testify about the words and actions of the principals. More recently, we affirmed the trial court's denial of a motion for judgment of acquittal primarily on the basis of written statements and oral testimony of two of the alleged participants. See *State v. Gianoulos, supra.* That evidence strongly indicated that the appellant knew beforehand of, and participated as a look -out in, the burning of a building other than a dwelling house in violation of G.L. 1956 (1969 Reenactment) § 11–4–3. *State v. Gianoulos*, 404 A.2d at 82–83.

▮ From the evidence on the record before us, however, we are not persuaded that all of the inferences that must be drawn to establish Badessa's guilt as an aider and abettor are reasonable and legitimate inferences. The record reveals that the four friends were seen together shortly before the shooting but indicates nothing other than the mere fact of association. The record includes the dying declaration in which the victim named defendant as the driver of the car but the record does not indicate that he had been so assigned as part of a prearranged plan as in *Colvin* and *Hart*, both *supra.* Moreover, Demirjian's statement reveals nothing of Badessa's words or conduct before the shooting that would enlighten us on his state of mind or his knowledge of impending criminal activity. From the tape we learn that Gazerro told Demirjian that Cipriano had ordered the shooting; however, no reason is given and no connection between Badessa and Cipriano is offered. Other than Demirjian's responses to Sgt. Ellingwood's questions, the record contains no written or oral statements or any testimony by any of the codefendants or by any other eyewitness, relating what occurred, from which the jury could reasonably conclude that Badessa had affirmatively participated in the shooting. *Compare State v. DaRocha*, R.I., 397 A.2d 500 (1979).

The state argues, and the trial justice agreed, that the evidence on the record and the inferences drawn therefrom establish that Gazerro, Badessa, and Ruggieri planned the killing and that Badessa's role was to drive while Gazerro's was to shoot the victim. *See id.* This hypothesis of prearrangement, however, rests to such an extent on inferences that it verges on speculation. We believe that our responsibility on review is to make sure that suspicion, speculation, or conjecture are not substituted for probative evidence of guilt beyond a reasonable doubt. *See United States v. Barber*, 429 F.2d 1394, 1397 (3d Cir. 1970). Taking account of the evidence and only what we believe are the reasonable inferences to be drawn therefrom in the present case, we find that the state failed to carry its burden to establish beyond a reasonable doubt that Badessa aided in and abetted the commission of the crime.[12]

12. The state argues that the record supports the inference that Badessa slowed or stopped the car in order that Demirjian could be pushed out. These circumstances may support an inference of after the fact complicity but do not help to overcome the reasonable doubt surrounding Badessa's participation *vel non* as an aider and abettor.

The appeal of defendant Gazerro is denied and dismissed, the judgment appealed from is affirmed, and his case is remanded to the Superior Court. The appeal of defendant Badessa is sustained, the judgment appealed from is reversed, and his case is remanded to the Superior Court for further proceedings.